**ONEIDA TRIBE OF INDIANS OF WISCONSIN, Plaintiff–Appellant,**

v.

**STATE of WISCONSIN, Tommy G. Thompson and Donald J. Hanaway, Defendants–Appellees.**

No. 90–3337.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 4, 1991.

Decided Dec. 20, 1991.

Milton Rosenberg, argued, Madison, Wis., Francis R. Skenadore, Oneida, Wis., for plaintiff-appellant.

Warren D. Weinstein, Asst. Atty. Gen., argued, Office of the Atty. Gen., Wis. Dept. of Justice, Madison, Wis., for defendants-appellees.

Before CUMMINGS, WOOD, Jr., and KANNE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

The parties are interested in the operation of games both agree are lotto. They dispute, however, just what the game of lotto is and, in particular, what game Congress intended when it used the term "lotto" in § 4(7)(A)(i) of the Indian Gaming Regulatory Act ("Act"). 25 U.S.C.A. §§ 2701–2721, 2703(7)(A)(i).

The Oneida Tribe of Indians of Wisconsin ("Oneida Tribe") argues the term "lotto" as used in the Act means a lottery-type game akin to the game of chance conducted as Lotto—spelled with a capital "L"—by various states, including Wisconsin. The State of Wisconsin ("State") argues Congress intended "lotto" to mean a game played on a card, very much like bingo, both in physical appearance and method of playing. In a well reasoned opinion the District Court for the Western District of Wisconsin, Barbara B. Crabb, C.J., found that "lotto" as used in the Act unambiguously means the latter. *Oneida Tribe of Indians v. Wisconsin*, 742 F.Supp. 1033 (W.D.Wis.1990). We affirm.[1]

The dispute arose in the course of the parties' negotiating a Tribal–State compact—an essential element if the Oneida Tribe is to conduct certain gaming operations on its tribal land—and has created an impasse. The impasse is one of categorization that turns upon the definition, or meaning, Congress intended for the term "lotto." The Act defines three categories of gaming, and that categorization in turn determines whether a state may prohibit or regulate gaming operations on Indian lands.

 The Act in pertinent part provides the following jurisdictional scheme for the control of gaming operations on Indian lands:

> (a)(1) Class I gaming on Indian lands is within the exclusive jurisdiction of the Indian tribes and shall not be subject to the provisions of this chapter.
>
> . . . .

---

1. Although we do not ordinarily rely on or cite unpublished opinions, we note as a matter of interest that the court in *Spokane Tribe of Indians v. United States*, No. C–90–388–RJM (E.D.Wash. April 9, 1991), utilized Chief Judge Crabb's opinion in reaching the same holding on a closely related question.

(b)(1) An Indian tribe may engage in, or license and regulate, class II gaming on Indian lands within such tribe's jurisdiction, if—

(A) such Indian gaming is located within a State that permits such gaming....

....

(d)(1) Class III gaming activities shall be lawful on Indian lands *only* if such activities are—

. . . . .

(B) located in a State that permits such gaming ... and

(C) *conducted in conformance with a Tribal–State compact* entered into by the Indian tribe and the State....

25 U.S.C.A. § 2710 (emphasis added).

While the United States has penultimate oversight, the Act permits a state to exercise various types of control over class II and class III games. *United Keetoowah Band of Cherokee Indians v. Oklahoma,* 927 F.2d 1170, 1175 (10th Cir.1991); *Seneca–Cayuga Tribe v. Oklahoma,* 874 F.2d 709, 713 (10th Cir.1989). If the games in question are class II gaming activities, as the Oneida Tribe claims, they may be prohibited by the State, but they cannot be regulated by the State. On the other hand, if the games are class III gaming activities, as the State claims, not only may the State prohibit them, but also the State may regulate them pursuant to a Tribal–State compact. Moreover, they cannot be operated lawfully unless done so under a Tribal–State compact or as otherwise authorized by the Act or the State.

The parties' concern is whether the Oneida Tribe can operate its games lawfully, free of State regulation. We also perceive, although the parties have not so stated, a concern for revenues: whether the State, via regulation and pursuant to a Tribal–State compact, can tax the Oneida Tribe's gaming revenues and whether the two

governments will compete as lottery operators for shares in the same market.

There is no dispute that the specific games at issue, denominated "Big Green" and "Cash–3," are lotteries, essentially indistinguishable from what a number of states, Wisconsin included, call "Lotto." In its brief the Oneida Tribe stated, "The 'Big Green' game is virtually identical to 'LottoAmerica/Megabucks,' a game operated by the State of Wisconsin, and is similar to other state lottery games." It also stated, "The tribe's second game, 'Cash–3,' is similar to state lottery games such as the 'Daily Game' or 'Pick–3.' "

## JURISDICTION

The Indian Gaming Regulatory Act grants federal courts jurisdiction over "any cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations ... or to conduct such negotiations in good faith ..." provided the parties follow statute-mandated procedures. 25 U.S.C.A. § 2710(d)(7)(A)(i), (B). The parties here have not followed those procedures and do not claim they have.

■ Federal jurisdiction arises, nonetheless, because one party is an Indian tribe seeking a declaratory judgment. 28 U.S.C. §§ 1362, 2201. Section 1362 provides, in relevant part, "The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe ... wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1362. The Declaratory Judgment Act creates the remedy.[2] We have, as one party, the Oneida Tribe of Indians of Wisconsin. This is a civil action, and, if there is a controversy, it has clearly arisen under the laws of the United States, specifically the Indian Gaming Regulatory Act, which became effective October 17, 1988. Furthermore, the district court's judgment is final. Thus, the only remaining question is whether this

---

**2.** In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such

declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such. 28 U.S.C. § 2201.

case constitutes an "actual controversy," one that "tracks the 'cases' or 'controversies' requirement of article III." *Harris Trust & Savings Bank v. E–II Holdings, Inc.*, 926 F.2d 636, 639 (7th Cir.1991).

■ The appropriate test to determine if there is an actual controversy, one ripe for decision, under the Declaratory Judgment Act is the one stated in *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941). *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 506, 92 S.Ct. 1749, 1755, 32 L.Ed.2d 257 (1972). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant issuance of a declaratory judgment." *Maryland Casualty*, 312 U.S. at 273, 61 S.Ct. at 512 (cited recently in *Infinity Broadcasting Corp. v. Prudential Insurance Co.*, 869 F.2d 1073, 1075 (7th Cir.1989)).

■ An actual controversy exists. The parties disagree over the meaning of the term "lotto" in the Act. Their negotiation of a Tribal–State compact is at an impasse because of their resolute disagreement. Further, their legal interests are adverse, and there is a clear showing of sufficient immediacy. As the district court stated,

> If ... the games are class II activities, plaintiff[, Oneida Tribe,] can offer them to the public now without waiting for the completion of the negotiations and without fearing that it will be subject to criminal sanctions. On the other hand, if defendants[, the State,] are correct that the games are properly classified in class III, plaintiff will lose all of its income from the games until and unless it can negotiate a tribal-state compact that permits the playing of such games.

*Oneida*, 742 F.Supp. at 1036–37.

Consequently, there is federal court jurisdiction under §§ 1362 and 2201, even though the parties have not followed the procedural steps mandated by the Act. 28 U.S.C. §§ 1362, 2201; 25 U.S.C.A. § 2710(d)(7).

## ANALYSIS

This case comes on appeal of a summary judgment in an action for declaratory judgment. The issue itself is purely a question of law. The appropriate standard of review, *de novo*, is so widely accepted that it is frequently applied without citation to authority. *See, for example, Mozee v. American Commercial Marine Service Co.*, 940 F.2d 1036, 1044 (7th Cir.1991) ("On issues of law, of course, our review is *de novo*."). Also, because "*de novo* review is compelled, no form of appellate deference is acceptable." *Salve Regina College v. Russell*, —— U.S. ——, 111 S.Ct. 1217, 1224, 113 L.Ed.2d 190 (1991).

■ We are specifically asked to determine the meaning of the term "lotto" as used in § 4(7)(A)(i) of the Indian Gaming Regulatory Act. That section of the Act is definitional and, in pertinent part, provides:

> (7)(A) The term "class II gaming" means—
>
> (i) the game of chance commonly known as bingo (whether or not electronic, computer, or other technologic aids are used in connection therewith)—
>
>> (I) which is played for prizes, including monetary prizes, with cards bearing numbers or other designations,
>>
>> (II) in which the holder of the card covers such numbers or designations when objects, similarly numbered or designated, are drawn or electronically determined, and
>>
>> (III) in which the game is won by the first person covering a previously designated arrangement of numbers or designations on such cards,
>
> including (if played in the same location) pull-tabs, *lotto*, punch boards, tip jars, instant bingo, and other games similar to bingo, and
>
> (ii) card games that ...

25 U.S.C.A. § 2703(7)(A) (emphasis added).

In attempting to divine the meaning of words or phrases in a statute, courts are guided by time-honored principles. If the "resolution of a question of federal law turns on a statute and the intention of

Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear." *Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1547–48, 79 L.Ed.2d 891 (1984). Only if the plain language of the statute is inconclusive or clearly contravenes expressed congressional intent do we look beyond the words themselves. *Kelly v. Wauconda Park Dist.,* 801 F.2d 269, 270 (7th Cir.1986); *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989). Otherwise, the " 'judicial inquiry is complete.' " *Burlington Northern Railroad v. Oklahoma Tax Comm'n,* 481 U.S. 454, 461, 107 S.Ct. 1855, 1859–60, 95 L.Ed.2d 404 (1986) (quoting *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701–02, 66 L.Ed.2d 633 (1981)).

PLAIN MEANING

█ Federal courts regularly turn to general and technical dictionaries to determine the plain meaning of a word or phrase.[3] Thus we turn to dictionaries and encyclopedias for the plain meaning of "lotto."

The definitions we find run the gamut from concise to comprehensive. One of the most concise is in *Webster's New World Dictionary* 800 (1988): "a game resembling bingo." The definition is somewhat expanded in *The American Heritage Dictionary* 743 (2nd College ed., 1982): "A game of chance played with numbered counters selected by lot to be placed upon the corresponding numbers on the players' boards." Similarly, *The World Book Dictionary* 1235 (1991) states: "a game played by drawing numbered disks from a bag or box and covering the corresponding numbers on cards. The first player to complete a blank row is the winner." In turn, *Webster's Third New International Dictionary* 1338 (1986) states: "a game played usu[ally] for a pool with cards bearing rows of numbers in which a caller draws numbered counters from a stock and each player covers the corresponding numbers if

they appear on his card, the winner being the one who first covers one complete row."

One of the most comprehensive definitions is given in *The Encyclopedia Americana* 17–762 (1988).

LOTTO ... is a lottery game played by any number of persons using numbered cards, or boards, and markers. Lotto is similar to bingo, but bingo boards are divided into five rows of five squares each, whereas lotto is played on boards divided into horizontal rows of nine squares. Five squares in each row are marked with numbers between 1 and 90, and 4 are left blank. No two boards are identical. As numbers selected by lot are called out, the players cover with markers those that appear on their boards. The player who first covers five numbers in a row wins.

In contrast the *Encyclopaedia Britannica* 14–328 (1973) simply states, *"see* BINGO."

From these modern definitions it is clear the State of Wisconsin is correct: lotto is a game of chance, played in a bingo-like setting on a bingo-like card, following bingo-like procedures. This conclusion is reinforced by the definition given in both the 1933 and the 1989 edition of *The Oxford English Dictionary,* but with an addition:

1. A game played with cards divided into numbered and blank squares and numbered disks to be drawn on the principle of a lottery.

 Each player has one or more cards before him; one of the disks is drawn from a bag, and its number called; a counter is placed on the square that has the same number, the player who first gets one row covered being the winner.

 . . . .

2. A lottery (of the Italian kind).

*The Oxford English Dictionary* VI–457 (1933), IX–43 (1989). The second definition of lotto does not detract from the significance, strength or specificity of the first.

---

3. *See, for example, American Textile Manufacturers Institute, Inc. v. Donovan,* 452 U.S. 490, 508–09, 101 S.Ct. 2478, 2490, 69 L.Ed.2d 185 (1981) (citing Webster's Third New International Dictionary and The Oxford English Dictionary); *Yockey v. Horn,* 880 F.2d 945, 949 (7th Cir.1989) (citing Black's Law Dictionary and The American Heritage Dictionary).

Rather it identifies the national origin of lotto and the fact that lotto, like bingo, is a game of chance.

The attributes of bingo and lotto further demonstrate the plain meaning of "lotto" does not encompass the broad, more general meaning, "lottery." Both bingo and lotto incorporate an element common to lotteries: the random selection of potentially winning numbers. A number of state courts have held that bingo and lotto are each a type of lottery.[4]

Bingo and lotto are highly similar: the only fundamental difference is the design of the card used. The two games are so similar that the dictionary definitions of "lotto" place it within the statutory definition of "bingo" spelled out in § 2703(7)(A)(i)(I)–(III). This high degree of similarity is because they are the offspring of a common progenitor, *Lo Giuoco del Lotto del Italia,* the Italian National Lottery, which began in 1530. John Scarne, *Scarne's New Complete Guide to Gambling,* 207–09 (1974). Bingo "is actually a more complicated version of the still-popular Italian parlor game of Lotto, which in turn derived from the more than 440–year-old Italian national lottery." *Id.* at 207. In the parlance of mathematicians and logicians, lotto and, similarly, bingo are subsets of the set, lottery. Thus, the use of the term "lotto" in the Indian Gaming Regulatory Act neither denotes nor implies the larger set, lottery. The term "lotto" can no more be construed to mean lottery than can the term "bingo."

OTHER CONSIDERATIONS

There is convincing evidence Congress can and does distinguish between "lottery" and "lotto." First, the former term, whether singular or plural, occurs in 29 sections of the United States Code ("Code")

and one recently enacted Public Law[5]; the latter term appears but once. Our reading of the Code sections shows no commingling, intermixing, interchanging or transposition of these terms.

Second, where Congress has used the term "bingo" in juxtaposition with either "lotto" or "lottery," it has not used the terms "lotto" and "lottery" interchangeably. Title 18 of the Code contains two identical references to bingo and lottery: "This section shall not apply to any bingo game, lottery, or similar game of chance conducted by an organization exempt from tax...." 18 U.S.C. §§ 1511(c), 1955(e). The Internal Revenue Code expressly exempts bingo winnings from withholding requirements but separately exempts lottery winnings only below a threshold amount. 26 U.S.C. §§ 3402(q)(3)(B), (C); 3402(q)(5). Moreover, in Public Law 102–111, Congress appropriated non-Federal revenues for the District of Columbia, Lottery and Charitable Games Enterprise Fund, which had been established "for the purpose of implementing the Law to Legalize Lotteries, Daily Numbers Games, and Bingo and Raffles for Charitable Purposes." Pub.L. No. 102–111, 105 Stat. 559 (1991). "Lotto," on the other hand, is juxtaposed with "bingo" only in the Indian Gaming Regulatory Act.

Congress has consistently demonstrated both the ability and the propensity to use the term "lottery" when that is its intent. Unquestionably, Congress would have used the term "lottery" in the Indian Gaming Regulatory Act had it so intended. That it chose instead to use the term "lotto" demonstrates it did not intend "lotto" to mean "lottery." Congress intended a different meaning: namely, the common dictionary meaning, a game physically and procedurally akin to bingo.

---

4. *See* the following cases and the citations therein: *State v. Mabrey,* 245 Iowa 428, 60 N.W.2d 889, 892–93 (1953); *A.B. Long Music Co. v. Commonwealth,* 429 S.W.2d 391, 394 (Ky.1968); *Secretary of State v. St. Augustine Church/St. Augustine School,* 766 S.W.2d 499 (Tenn.1989). *See also,* 54 C.J.S. *Lotteries* § 7, at 489 (1987) ("It is generally held that the game variously designated as 'bingo,' 'lotto,' 'keno,' 'beano,' 'screeno,' or the like is a lottery.").

5. 8 U.S.C. § 1101; 12 U.S.C. §§ 25, 339, 1463, 1730, 1829; 18 U.S.C. §§ 1081, 1301, 1302, 1303, 1304, 1305, 1306, 1307, 1511, 1953, 1955; 19 U.S.C. §§ 1305, 1553, 2112; 20 U.S.C. § 107; 26 U.S.C. §§ 3402, 4401, 4402, 4404, 4421, 5723; 39 U.S.C. § 3005; 43 U.S.C. § 1353; and Pub.L. No. 102–111, 105 Stat. 559 (1991). Additionally, the term "lottery" or "lotteries" appears in over 50 sections of the District of Columbia Code, but the term "lotto" appears in not one section.

In addition the plain meaning of "lotto" is in harmony with the tenor of the subsection of the act within which it appears. That subsection, stripped to its essential elements, defines "class II gaming" as comprising two types of games: "(i) the game of chance commonly known as bingo ... including (if played in the same location) pull-tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo, and (ii) [certain] card games...." 25 U.S.C.A. § 2703(7)(A). Although not all the games named in § 2703(7)(A)(i) may be bingo-like, either physically or procedurally, clearly the emphasis is bingo. Furthermore, the three named games that are least like bingo—pull-tabs, punch boards, and tip jars—are quite similar to instant bingo,[6] where a player takes one chance on being an instant winner or loser. They are not like the state-run lottery games known as "Lotto." Thus, defining "lotto" as "a bingo-like game" is not at odds with but, rather, is harmonious with the tenor and intent of that subsection.

Lastly, our reading of the whole Act reveals no conflict with the finding that "lotto" means the bingo-like game. The effect or import of no other section or subsection is diminished. The stated congressional findings and declaration of policy in the Act are well served by our finding. 25 U.S.C.A. §§ 2701, 2702.

## THE CANON OF LIBERAL CONSTRUCTION

It is a long-standing canon that the language of treaties and statutes dealing with Indian tribes should be liberally construed or interpreted in their favor. *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 582, 8 L.Ed. 483 (1832); *Winters v. United States,* 207 U.S. 564, 576–77, 28 S.Ct. 207, 211–12, 52 L.Ed. 340 (1908); *Blatchford v. Native Village of Noatak,* —— U.S. ——, 111 S.Ct. 2578, 2589–90, 115 L.Ed.2d 686 (1991)

(Blackmun, J., dissenting). This canon, however, "does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress." *South Carolina v. Catawba Indian Tribe, Inc.,* 476 U.S. 498, 506, 106 S.Ct. 2039, 2044, 90 L.Ed.2d 490 (1986) (citing, among others, *Rice v. Rehner,* 463 U.S. 713, 732, 103 S.Ct. 3291, 3302–03, 77 L.Ed.2d 961 (1983)). Thus, courts do not always adopt the construction or interpretation put forth by an Indian tribe. *See, for example, United States v. Cherokee Nation of Oklahoma,* 480 U.S. 700, 107 S.Ct. 1487, 94 L.Ed.2d 704 (1987) (Federal navigational servitude is superior to Indian tribe's title to river bed.).

The Oneida Tribe argues it is entitled to a liberal, favorable construction or interpretation of the Act because (1) the term "lotto" as used in the Act is ambiguous, (2) the controversy is between the government and an Indian tribe, and (3) ambiguities in federal statutes dealing with Indian matters should be resolved in the Indians' favor. In support of their argument the Oneida Tribe cites *Choate v. Trapp,* 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941 (1912). That Court stated:

> [I]n *Jones v. Meehan,* 175 U.S. 1[, 11, 20 S.Ct. 1, 5, 44 L.Ed. 49 (1899) ], it was held that "Indian treaties must be construed, *not according to the technical meaning of their words, but in the sense in which they would naturally be understood* by the Indians." In view of the universality of this rule, Congress is conclusively presumed to have intended that the legislation under which the allotments were made to the Indians should be liberally construed in their favor in determining the rights granted to the Choctaws and Chickasaws.

*Choate,* 224 U.S. at 675, 32 S.Ct. at 569 (emphasis and bracketed matter added).[7]

---

**6.** Descriptions of these games may be found in *Wolf v. Federal Trade Comm'n,* 135 F.2d 564 (7th Cir.1943) (pull-tabs); *James v. Federal Trade Comm'n,* 253 F.2d 78 (7th Cir.1958) (punch boards); Ore. Att'y Gen. OP–6300, n. 2 (September 26, 1990) (punch boards and tip-jars); Md. Att'y Gen. Opinion No. 88–016, n. 1 (March 11, 1988) (tip-jars); *State v. Beane,* 52

Ohio Misc. 115, 370 N.E.2d 793, 795, 6 Ohio Op.3d 447 (1977) (instant bingo).

**7.** The *Choate* Court took some inconsequential, editorial liberties in quoting *Jones.* The cited text actually reads, "[I]t must always ... be borne in mind that ... and that the treaty must therefore be construed, not according to the

Accordingly, it is the traditional, dictionary definition of "lotto" that would be naturally understood, not the technical usage of the term by the contemporary gaming-industry. This negates the Oneida Tribe's complaint that the district court used "an outdated dictionary definition … rather than the contemporary meaning of the term as used in the gaming industry." Both our use and the district court's use of the dictionary definition of "lotto" fully comply with the principle enunciated in *Choate.*

The Oneida Tribe also cites *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), for the proposition that liberal construction is especially applicable in matters of tribal self-governance. That synopsis, however, is incomplete and skews the Court's holding. The complete statement of the Court's position is as follows:

> Although Congress clearly has power to authorize civil actions against tribal officers, and has done so with respect to habeas corpus relief in § 1303, a proper respect *both* for tribal sovereignty itself *and* for the plenary authority of Congress in this area cautions that we tread lightly in the absence of clear indications of legislative intent.

*Id.* at 60, 98 S.Ct. at 1678 (emphasis added; code citation is to 25 U.S.C. § 1303).[8] The Court was urging caution in interpreting legislative intent where the concern was respect for *both* congressional plenary authority *and* tribal sovereignty, not tribal sovereignty alone.

Moreover, the issue in *Santa Clara Pueblo* was not the meaning of a word or phrase in a statute. Rather, the issue was whether Title II of the Indian Civil Rights Act of 1968 (codified at 25 U.S.C. §§ 1301–1303) implicitly allowed a tribal member to bring a civil action for injunctive or declaratory relief against a tribe, although the Act did not expressly authorize such action, having, instead, only authorized civil action for habeas corpus relief. The Court found Congress could have authorized the additional civil actions had it so desired; thus, the Court declined respondent's invitation to expand the act by reading that authorization into it. Although we are not asked to read additional words into a statute, we are asked, nonetheless, to expand its reach by expanding the meaning of a term in it. *Santa Clara Pueblo* counsels against such expansive interpretations where Congress has plenary authority but does not exercise it. It is, therefore, appropriate that we reject the Oneida Tribe's argument and affirm that Congress intended the term "lotto" to denote its plain, dictionary meaning.

The alleged ambiguity that would permit liberal construction of the term "lotto" in favor of the Oneida Tribe does not exist. Were we to adopt the construction urged by the Oneida Tribe, it "would be tantamount to a formalistic disregard of congressional intent." *Rice v. Rehner,* 463 U.S. 713, 732, 103 S.Ct. 3291, 3302, 77 L.Ed.2d 961 (1983).

## CONCLUSION

Although the term "lotto" has different meanings, we find the plain meaning of "lotto" as used in the Indian Gaming Regulatory Act is the common, or first, meaning published in dictionaries. "Lotto" in this context means a game of chance, played in a bingo-like setting on a bingo-like card, following bingo-like procedures. It does

---

technical meaning of its words to learned lawyers, but in the sense in which they would be naturally understood by the Indians." *Jones,* 175 U.S. at 11, 20 S.Ct. at 5 (bracketed matter and ellipses added). In turn, the Oneida Tribe took some arguably more consequential, editorial liberties in quoting *Choate:* " 'Given the universality of this rule, Congress is conclusively presumed to have intended that this legislation … be liberally construed in [the Indians'] favor.' " Appellant's Brief at 12 (quoting *Choate,* 224 U.S. at 675, 32 S.Ct. at 569; bracketed material and ellipses provided by appellant.).

**8.** Here too, the Oneida Tribe has taken editorial liberties with the quotation it offers. It quotes the Court parenthetically as follows: "('[A] proper respect … for tribal sovereignty cautions that we tread lightly in the absence of clear indications of legislative intent.')." Appellant's Brief at 12 (citing *Santa Clara Pueblo,* 436 U.S. at 60, 98 S.Ct. at 1678; bracketed matter and ellipses added by appellant). The quotation as presented, however, inaccurately portrays the Court's position.

not mean lottery in general or the type of lottery operated by various states and denominated "Lotto" or some derivative thereof. The meaning we adopt harmonizes with the thrust of § 2703(7)(A)(i), with its tenor and intent: namely, the exemption of only bingo and other similar games from state regulation when played on Indian lands. Additionally, accepting this meaning does not "produce a result demonstrably at odds with the intention of the drafters." *Ron Pair*, 489 U.S. at 242, 109 S.Ct. at 1031. Neither does it contravene any other section of the Act. Lastly, Congress has consistently used the term "lottery" or "lotteries" when that was its intent. To find Congress used "lotto" to mean "lottery" would be tantamount to disavowing the plenary power of Congress; that we cannot do.

Therefore, the judgment and orders of the District Court for the Western District of Wisconsin are

AFFIRMED.