**SISSETON–WAHPETON SIOUX TRIBE, Plaintiff,**

v.

**UNITED STATES of America and Richard Thornburgh in his capacity as Attorney General of the United States, Defendants.**

**No. Civ. 91–1013.**

United States District Court, D. South Dakota, N.D.

Sept. 28, 1992.

Bertram E. Hirsch, Floral Park, N.Y., Terry L. Pechota, Rapid City, S.D., for plaintiff.

Robert A. Mandel, Asst. U.S. Atty., Rapid City, S.D., for defendants.

## MEMORANDUM OPINION.

BATTEY, District Judge.

### PROCEDURAL HISTORY

On July 11, 1991, plaintiff Sisseton–Wahpeton Sioux Tribe (tribe) filed a complaint seeking a declaration that keno and pick bingo are class II games and not class III games under the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701–2721. Jurisdiction is premised on the existence of a question arising under federal law, 28 U.S.C. § 1331, and the availability of declaratory relief, 28 U.S.C. §§ 2201–2202.

The parties agreed to submit the case to the Court on stipulated facts. Pursuant to this agreement, simultaneous cross motions for summary judgment and for dismissal were submitted on January 6, 1992. On January 21, 1992, simultaneous responses to the cross motions were filed by both parties. Among the motions made by defendants United States of America and Richard Thornburgh (government) in their initial brief was a motion that the tribe's request for relief be stayed pending promulgation of final regulations by the National Indian Gaming Commission (NIGC) clarifying the definitions of class II and class III gaming under the IGRA.

The Court granted the government's motion to stay proceedings pending the promulgation of final regulations by the NIGC. The NIGC regulations became final on April 9, 1992, and classified keno as a class III game. Pick bingo is not specifically addressed by the NIGC regulations.

After the NIGC regulations became final, the parties amended their motions. The issues presented by these amended cross motions are as follows:

1. whether the tribe's complaint presents a ripe controversy;

2. whether the NIGC regulations classifying keno as a class III game are valid; and

3. whether pick bingo is a class II or class III game under the IGRA and the NIGC regulations.

The Court holds the tribe's complaint regarding keno to be ripe and the NIGC regulation regarding keno to be valid. Because the Court finds the tribe's complaint regarding pick bingo to lack ripeness, the third issue will not be addressed.

### FACTS

Plaintiff is a federally-recognized Indian tribe which currently runs two gaming casinos. The tribe and the state of South Dakota negotiated a gaming compact, but the terms of that compact do not authorize the tribe to operate keno and pick bingo gaming. The tribe has not yet begun to operate these two games at either of its

casinos, but states it would like to begin operating both games at its Dakota Sioux Casino in Watertown, South Dakota.

The tribe contacted Philip N. Hogen, then United States Attorney for the District of South Dakota, and asked for his opinion as to whether keno and pick bingo constituted class II or class III games under the IGRA. On June 19, 1991, Hogen wrote that, in his opinion, both games were class III games under the IGRA and would require a compact with South Dakota in order to be operated legally.[1] Following receipt of Hogen's letter, the tribe filed this lawsuit.

The tribe and the government have agreed upon stipulated facts describing the operation of keno and pick bingo.

## A. Keno

Keno is a "house percentage banking game" in which the house pays all winners and collects from all losers. The house essentially acts as a player in the game which "takes on" all other players. Thus, the house has a stake in the outcome of the game. The game is played with cards provided by the house. The cards are numbers from 1 to 80 printed in numerical order on eight adjacent horizontal rows of 10 numbers each. The keno player designates a quantity of numbers or combination of connected numbers up to 15 numbers total to win. After designating these numbers, the keno player presents his card together with his bet to the keno operator, who validates and places the card in play. Variations in the game are permitted by the house rules.

Prior to opening the game for play, the keno operator determines the minimum bet amount and, based on that amount, also determines the amount of money to be paid out to any winners of the game. This calculation is made so that the odds favor the house.

After all players have had their cards validated, the keno operator randomly draws twenty numbers from a pool containing the numbers 1 through 80. The game always ends after the twenty numbers are drawn, whether there has been a winner before that time or whether there has been no winner. At the conclusion of the game, the keno operator pays all winners. The house keeps all bets not paid out.

## B. Pick Bingo

Pick bingo is essentially identical to keno. Pick bingo is also a house percentage banking game, played on cards provided by the house, in which it is possible to have multiple winners or no winner in any given game. The only significant difference is in the total numbers involved. In pick bingo, the cards contain the numbers 1 to 75, instead of 1 to 80 as in keno; the players select up to 10 numbers to win, instead of the maximum of 15 allowed in keno; and the pick bingo operator draws 15 numbers in a game, instead of the 20 drawn in a keno game.[2] The game is won

---

1. Hogen stated in pertinent part:

 I did review the materials which [the tribe] sent, and if I accurately understand the Pick Bingo and Power Keno games described therein, I understand them to be slight variations of the same game. I would understand this to be a game of chance whereby one or more players purchase a chance to select one or more numbers, and when all such selections have been made a mechanical or electronic device randomly selects a given number of numbers, and if such numbers match those selected by the players, the players may win prizes. Such arrangement *would not seem to comply* with 25 U.S.C. § 2703(7)(a)(III), which defines bingo as a game "in which the game is won by the first person covering a previously designated arrangement of numbers or designations on such cards...."

 It is my understanding that the recently staffed National Indian Gaming Commission is currently drafting regulations which will include more specific definitions of those games which constitute Class II gaming. It is certainly possible that the Commission will take a less conservative view of this matter than expressed above.

 \* \* \* \* \* \*

 It is my present view that to play such games without the benefit of a compact would violate federal law.

 *See* Defendant's Brief in Support of Motion to Dismiss, or Motion to Stay, or Motion for Summary Judgment, exhibit 3 (filed January 6, 1992) (emphasis supplied).

2. The parties also submitted a description of the game of bingo in their stipulated facts. Howev-

by the person or persons whose previously designated number or numbers on the pick bingo card are called. Variations in the game are permitted by the house rules.

## DISCUSSION

The IGRA provides in part that an Indian tribe may operate class II gaming on its reservation if "such Indian gaming is located within a State that permits such gaming." 25 U.S.C. § 2710(b)(1)(A). Indian tribes can operate class III gaming only if such gaming is "located in a State that permits such gaming" and if such gaming is "conducted in conformance with a Tribal–State compact entered into by the Indian tribe and the State." 25 U.S.C. § 2710(d)(1)(B), (C). South Dakota statutes on bingo and keno are inapplicable to the tribe's proposed operation of those games as class II games.[3] Therefore, the issue presented must be decided exclusively by reference to federal statutes and regulations.

The Indian Gaming Regulatory Act (IGRA) defines class II gaming in part as:

the game of chance commonly known as bingo (whether or not electronic, computer, or other technologic aids are used in connection therewith)—

(I) which is played for prizes, including monetary prizes, with cards bearing numbers or other designation,

(II) in which the holder of the card covers such numbers or designations when objects, similarly numbered or designated, are drawn or electronically determined, and

(III) in which the game is won by the first person covering a previously des-

ignated arrangement of numbers or designations on such cards,

including (if played in the same location) pull-tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo.

25 U.S.C. § 2703(7)(A)(i). The IGRA defines class III gaming as "all forms of gaming that are not class I gaming or class II gaming." *Id.* § 2703(8).

The National Indian Gaming Commission (NIGC) promulgated regulations to further clarify what constitutes class II and class III gaming. These regulations became final on April 9, 1992.

The NIGC defined class II gaming in pertinent part as follows:

(a) Bingo or lotto (whether or not electronic, computer, or other technologic aids are used) when players:

(1) Play for prizes with cards bearing numbers or other designations;

(2) Cover numbers or designations when objects similarly numbered or designated are drawn or electronically determined; and

(3) Win the game by being the first person to cover a designated pattern on such cards;

(b) If played in the same location as bingo or lotto, pull-tabs, punch boards, tip jars, instant bingo, and other games similar to bingo;

25 C.F.R. § 502.3.

Expanding on the reference to "other games similar to bingo" found in the IGRA definition of class II gaming, the NIGC defined this phrase as "any game that

er, because the IGRA defines this game in sufficient detail, that description prevails over the description stipulated to by the parties.

**3.** Interpreting section 2710 of the IGRA, the Eighth Circuit has stated that tribal operation of class II games must comply with state gaming statutes only if the state statutes are prohibitory rather than regulatory. *United States v. Sisseton–Wahpeton Sioux Tribe,* 897 F.2d 358, 365–67 (8th Cir.1990). The court held that if a state permitted a particular form of gaming, then its statutes regarding that form of gaming were regulatory, not prohibitory. *Id.* at 367–68 (citing *California v. Cabazon Band of Mission Indi-*

*ans,* 480 U.S. 202, 210–11, 107 S.Ct. 1083, 1089–90, 94 L.Ed.2d 244, 255–56 (1987)). Because South Dakota permitted blackjack as a form of gaming, the eighth circuit held that South Dakota statutes limiting the pot and wager amounts for blackjack were regulatory, not prohibitory, and thus did not apply to blackjack gaming conducted by the tribe in South Dakota pursuant to the IGRA. *Id.* at 368. Thus, because South Dakota permits bingo and keno in general, SDCL §§ 22–25–23 to 22–23–51, South Dakota statutes regarding these games are regulatory and thus inapplicable to the tribe's proposed operation of these games.

meets the requirements for bingo under § 502.3(a) of this part [see above] and that is not a house banking game under § 502.11 of this part." 25 C.F.R. § 502.9. The NIGC defined class III gaming as "all forms of gaming that are not class I gaming or class II gaming, including but not limited to: any house banking game ... such as keno." 25 C.F.R. § 502.4(a)(2). The NIGC defined the term "house banking game" as any "game of chance that is played with the house as a participant in the game, where the house takes on all players, collects from all losers, and pays all winners, and the house can win." 25 C.F.R. § 502.11.

The NIGC regulations do not mention the game of pick bingo. It was suggested during the hearings on these regulations that the NIGC evaluate a number of specific games to determine if such games are "games similar to bingo" within the meaning of the IGRA and the NIGC regulations. The NIGC declined to do so, instead promulgating the more general definition found at 25 C.F.R. § 502.9. However, the NIGC pointed out that if a tribe wanted to engage in new games not mentioned by the regulations and which the tribe believed to fall within the definition of section 502.9, the tribe can ask the NIGC for an advisory opinion as to whether the game in fact falls within the class II or class III category. *See* Preamble to Final Regulations, *Games Similar to Bingo.*

## A. Ripeness

Before this Court can reach the merits of plaintiff's claim, it must first determine that the claim is justiciable. The government requests dismissal of the tribe's complaint because it is not ripe and thus does not present a case or controversy. The government argues that ripeness is lacking both because the tribe is not yet operating

keno and pick bingo games and because there is no threat of prosecution.

 The requirement that federal courts restrict their powers to deciding concrete cases and controversies is founded in Article III, section 2 of the Constitution. The related ripeness doctrine is a judicially-created limitation on the exercise of jurisdiction, deriving from the limited nature and function of the federal courts. *Poe v. Ullman,* 367 U.S. 497, 502–03, 81 S.Ct. 1752, 1755, 6 L.Ed.2d 989, 995 (1961); *Meadows of W. Memphis v. City of W. Memphis,* 800 F.2d 212, 214 (8th Cir.1986); and *Bergstrom v. Bergstrom,* 623 F.2d 517, 519 (8th Cir.1980). The rationale for requiring ripeness before deciding an issue is that "the adjudicatory process is most securely founded when it is exercised under the impact of a lively conflict between antagonistic demands, actively pressed, which make resolution of the controverted issue a practical necessity." *Poe,* 367 U.S. at 503, 81 S.Ct. at 1755, 6 L.Ed.2d at 995. *See also Meadows of W. Memphis,* 800 F.2d at 214; and *Bergstrom,* 623 F.2d at 519.[4]

 The ripeness issue is not jurisdictional, but like issues relating to subject matter jurisdiction, may be raised *sua sponte* by the court at any level of the proceedings. *Meadows of W. Memphis v. City of W. Memphis,* 800 F.2d at 214; *Bergstrom,* 623 F.2d at 519; and 10A Wright, Miller, & Kane, *supra,* § 2757, at 620. The ripeness doctrine is also similar to subject matter jurisdiction in that an agreement by the parties to allow a court to decide an issue that is not ripe is not binding on the court. *Hunt v. Roth,* 648 F.2d 1148, 1153 (8th Cir.1981), *vacated as moot,* 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982); and 10A Wright, Miller, & Kane, *supra,* § 2757, at 620. Accordingly, in deciding whether the tribe's claim is ripe, this Court is not bound by

---

**4.** Although the doctrines of standing, ripeness, and mootness are all related to the case or controversy requirement, they are distinct doctrines with distinct requirements. *See generally* 10A Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2757, at 581–86 (1983). Thus, it is possible for a plaintiff to have standing without the

plaintiff's claim possessing the requisite ripeness to render the claim justiciable. *See American–Arab Anti–Discrimination Comm. v. Thornburgh,* 940 F.2d 445, 453 (9th Cir.1991) (holding that the plaintiff had standing, but that the plaintiff's claim was not ripe, and therefore was not justiciable).

allegations in the tribe's complaint or by stipulations entered into by the parties. *Hunt,* 648 F.2d at 1153; and 10A Wright, Miller, & Kane, *supra,* § 2757, at 620. *But cf. Meadows of W. Memphis,* 800 F.2d at 215 (stating that, on appeal from a motion to dismiss for lack of ripeness, the appellate court must accept as true allegations in plaintiff's complaint).

The case or controversy requirement as it relates to the ripeness doctrine and the Declaratory Judgment Act is not susceptible of resolution through application of a bright-line test.[5] The standard to be applied is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826, 828 (1941). Because this Court finds that the tribe's claim as to pick bingo presents significant differences from its claim as to keno, the ripeness of each of these claims will be analyzed separately.

### 1. Pick Bingo

■■■ The tribe's complaint as to pick bingo presents a number of unresolved contingencies. First, it is unclear that the tribe will engage in pick bingo at all. This Court has the tribe's statement that it wishes to operate these games, but this Court does not have to accept as true all assertions made in the complaint. *Poe,* 367 U.S. at 501, 81 S.Ct. at 1754, 6 L.Ed.2d at 994. The tribe has not shown preparation to engage in pick bingo or some other indication of commitment to this path of action.

Second, it is unclear that the tribe would be prosecuted for engaging in pick bingo. The statement by Hogen in his June 16, 1991, letter can hardly be characterized as a credible threat of prosecution.[6] Furthermore, Hogen is no longer the United States Attorney for the District of South Dakota. While Hogen's successor is under the same duty to enforce federal laws in this district, he may differ from Hogen in his interpretation of those laws including IGRA.

Finally, and perhaps most importantly, the tribe has another avenue which it can pursue for relief. The NIGC stated in its preamble to the April 9, 1992, regulations that any Indian tribe seeking to engage in a game which it felt was a "game similar to bingo" and which is not specifically covered by the NIGC regulations, can seek an advisory opinion as to the status of the proposed game. Pick bingo is not specifically covered by the NIGC regulations. Therefore, the tribe can seek a declaratory judgment from the NIGC as to whether this is a "game similar to bingo." The availability of administrative relief renders the pick bingo claim not ripe for this Court's determination. *See Delzer Construction Co. v. United States,* 487 F.2d 908, 909–10 (8th Cir.1973) (per curiam) (holding plaintiffs' claim to lack ripeness where an administrative hearing was available to contest a proposed administrative declaration, and plaintiffs did not avail themselves of this opportunity before seeking an injunction against agency action in district court). *Cf. Diebold v. Civil Serv. Comm'n,* 611 F.2d 697, 698–700 (8th Cir.1979) (holding plaintiff's request for an injunction against enforcement of agency rules against him to lack ripeness where plaintiff had not yet submitted himself to the agency hearing and thus it was not clear that the agency would enforce the rules in question against plain-

---

**5.** It is important at the outset to distinguish the instant case from cases involving requests for declarations concerning the enforcement of state statutes. The line of cases originating out of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), deals with declaratory judgment actions involving state statutes. The rules developed under *Younger* are influenced to a great degree by concerns of comity and federalism inherent when a federal court intervenes in state enforcement of state laws. Feder-

alism concerns are not implicated in the instant case where the statute being challenged by the tribe is a federal statute. The instant case does, however, present comity concerns in that a declaration entered pursuant to the tribe's request will interfere with enforcement of the laws by the executive branch.

**6.** *See* note 1 for the partial text of this letter.

tiff). The tribe's claim concerning pick bingo is therefore dismissed on the ground of lack of ripeness.

### 2. Keno

██ Although the posture of the tribe's claim as to keno presents the same contingencies as does its pick bingo claim, there is one important difference: the tribe cannot obtain an advisory opinion from the NIGC as to the validity of the NIGC keno regulations. This Court will not force the tribe to choose between forgoing keno operations or committing a criminal act.

A similar conclusion was reached by the United States Court of Appeals for the Seventh Circuit in *Oneida Tribe of Indians v. Wisconsin*, 951 F.2d 757 (7th Cir.1991). A dispute over whether the game of lotto constituted class II or class III gaming under the IGRA brought negotiations between the state of Wisconsin and the Oneida Tribe to an impasse. *Id.* at 758.[7] The court was asked to render a declaratory judgment on the issue. *Id.*

Addressing the ripeness issue, the Seventh Circuit stated the familiar standard from *Maryland Casualty* that, under all the circumstances, the facts alleged must "show that there is a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant judgment." *Id.* at 760. The court found the claims to be ripe because the interests of the litigants were adverse, there was a sufficient showing of immediacy, and the negotiation of the tribal-state compact was at an impasse because of the dispute. *Id.*

This Court recognizes that the facts of *Oneida Tribe* differ from the facts presented by the tribe's keno claim. In *Oneida Tribe*, the Oneida Tribe Indians were engaged in compact negotiations with the state over the precise issue presented. The

facts of this case do not involve such negotiations. Nonetheless, this Court finds *Oneida Tribe* persuasive.[8]

The tribe in this case is incurring losses every day that it does not engage in keno gaming. *See Meadows of W. Memphis v. City of W. Memphis*, 800 F.2d 212, 213–15 (8th Cir.1986) (holding ripe plaintiff's claim for declaratory relief as to the validity of a city council's resolution postponing for a year a decision on whether to grant plaintiff funding because the plaintiff would lose the economic benefits for the one-year delay period). *See also Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 81–82, 98 S.Ct. 2620, 2634–35, 57 L.Ed.2d 595, 616 (1978) (holding ripe plaintiffs' request for a declaration of the invalidity of damages limitations on private liability for nuclear accidents where no such accident had yet occurred because plaintiffs suffered present harm such as loss in property values).

Furthermore, the tribe's claim is as immediate as it can become without requiring the tribe to actually engage in the gaming and suffer the risk of criminal prosecution. Having found the tribe's keno claim to present a ripe controversy, the issue of the validity of the NIGC regulations are before the Court.

### B. Validity of NIGC Regulations

The tribe in its amended motion for summary judgment makes three arguments why this Court should invalidate the NIGC regulations:

1. the NIGC interpretation of "games similar to bingo" does not give meaning to the word "similar" because under those regulations, a game must be identical to bingo in order to qualify as "similar to bingo";

2. the NIGC relied on trivial, almost meaningless distinctions between

---

**7.** *Oneida Tribe of Indians* was decided before the NIGC promulgated its current regulations. Under those regulations, lotto is clearly a class II game. *See* 25 C.F.R. § 502.3.

**8.** The facts presented by the tribe's keno claim are similar to those presented in a previous lawsuit between these same parties. *United*

*States v. Sisseton–Wahpeton Sioux Tribe*, 897 F.2d 358 (8th Cir.1990). In that case, the Eighth Circuit did not address the ripeness issue, but the fact that the court found the claims to be ripe are implicit in the court's deciding of the merits of that case.

keno and bingo in deciding keno should be a class III game; and

3. the NIGC failed to observe the established rule of construction that ambiguities in the IGRA should be liberally construed in favor of Indian tribes.

### 1. Standard of Review

The landmark case on the standard of judicial review of agency rulemaking is *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In that case, the United States Supreme Court outlined a four-step inquiry to determine what level of review a court should employ when reviewing the validity of an agency rule.

First, the court should inquire whether congressional intent on the issue in question is clear or ambiguous. If it is clear, the standard of review is de novo. *Id.* at 842–43, 104 S.Ct. at 2783, 81 L.Ed.2d at 703.

Second, if congressional intent is ambiguous, the court should inquire whether the agency has interpreted the statute already. If not, the court may interpret the statute on a de novo basis. If the agency has interpreted the statute, further inquiry is necessitated. *Id.* at 843, 104 S.Ct. at 2782, 81 L.Ed.2d at 703.

Third, if the agency has interpreted the statute, the court must ascertain whether Congress expressly delegated the power to so interpret to the agency, or if the agency's power to interpret is implied. *Id.* at 843–44, 104 S.Ct. at 2782, 81 L.Ed.2d at 703.

■ Finally, if the court finds that Congress expressly delegated to the agency the power to interpret the statute, then the agency's interpretation should not be overturned by the court unless that interpretation is arbitrary and capricious. *Id.* If the

court finds that the agency's power to interpret the statute is impliedly delegated, the court should not overturn the agency's interpretation unless it is unreasonable. *Id.*

The Eighth Circuit follows the dictate of *Chevron. See United States v. Galloway,* 976 F.2d 414 (8th Cir.1992) (applying the de novo standard of review from *Chevron* to a regulation promulgated by the United States Sentencing Commission where the court found congressional intent to be clear); *Tyrrell v. Sullivan,* 972 F.2d 252 (8th Cir.1992) (applying the arbitrary and capricious standard of review from *Chevron* to a regulation promulgated by the Secretary of Health and Human Services where congressional intent was unclear and the delegation to interpret the statute was explicit); and *Arkansas v. Sullivan,* 969 F.2d 622 (8th Cir.1992) (applying the reasonableness standard of review from *Chevron* to a regulation promulgated by the Secretary of Health and Human Services where congressional intent was unclear and the delegation to interpret the statute was implied).

■ Applying *Chevron* to the facts before it, this Court must first inquire whether the intent of Congress is clear as to the definition of "games similar to bingo" and whether keno falls within that classification. Nowhere in the IGRA itself or the legislative history of that act is keno specifically mentioned or the phrase "games similar to bingo" ever defined. *See* 25 U.S.C. §§ 2701–2721, and S.Rep. No. 446, 100th Cong., Sess. 9 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071–3106. Accordingly, this Court must conclude that congressional intent is ambiguous on this issue.[9]

Second, the Court must inquire whether the NIGC has interpreted the IGRA. As discussed above, the NIGC has interpreted the IGRA, promulgating regulations that describe in greater detail the distinction

**9.** There are general statements in the legislative history of the IGRA regarding the broad purposes and concerns for that legislation. Plaintiff tries to parlay these statements into clear indication of Congressional intent. However, as the *Chevron* Court stated, "[w]e are not per-

suaded that parsing of general terms in the text of the statute will reveal an actual intent of Congress. We know full well that this language is not dispositive ..." *Chevron U.S.A., Inc.,* 467 U.S. at 861–62, 104 S.Ct. at 2791, 81 L.Ed.2d at 714 (footnote omitted).

between class II and class III gaming as well as defining the phrase "games similar to bingo."

Third, the Court must ascertain whether Congress expressly or impliedly delegated the power to the NIGC to interpret the statute in question. *Chevron* states that "[i]f Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *Chevron U.S.A., Inc.,* 467 U.S. at 843–44, 104 S.Ct. at 2782, 81 L.Ed.2d at 703. Neither the IGRA nor its legislative history reveal such an explicit delegation to the NIGC to "fill the gap" by defining what constitutes "games similar to bingo." *See* 25 U.S.C. §§ 2701–2721. The authority of the NIGC to clarify the phrase comes from its expressly delegated power to regulate class II and certain aspects of class III gaming by Indian tribes. 25 U.S.C. §§ 2706(b), 2710(b)–(e), 2711–2713, and 2715–2716. Therefore, the delegation to interpret the statute must be held to be implied. Accordingly, the NIGC regulations must be upheld unless they are found to be "unreasonable." *Chevron, U.S.A., Inc.,* 467 U.S. at 843–44, 104 S.Ct. at 2782, 81 L.Ed.2d at 703.

### 2. Reasonableness Standard of Review

██ In the *Chevron* case itself, congressional intent was unclear as to what constituted a "stationary source" of pollution under the Clean Air Act and its amendments. Therefore, the Environmental Protection Agency ("EPA"), pursuant to impliedly delegated authority, defined that term using a "bubble concept," so that all pollution-emitting sources at a single facility would constitute one "stationary source." The Supreme Court upheld the EPA interpretation as reasonable. *Id.* at 845, 104 S.Ct. at 2783, 81 L.Ed.2d at 704.

The Court examined the legislative history of the statute and found that it embodies two competing policies: to make inroads on air pollution while not excessively impeding reasonable economic growth of industries. *Id.* at 851–52, 104 S.Ct. at 2786, 81 L.Ed.2d at 708. The Court held the

EPA definition to be reasonable because, in promulgating it, the agency had "considered the matter in a detailed and reasoned fashion" and tried to accommodate the conflicting policies of the statute. *Id.* at 865, 104 S.Ct. at 2792–93, 81 L.Ed.2d at 716.

The IGRA, like the Clean Air Act in *Chevron,* embodies competing policies. One purpose of the IGRA is to promote "tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). This purpose respects and encourages Indian tribal sovereignty. However, another stated purpose of the IGRA is more paternalistic and at odds with the idea of Indian self-determination. This second purpose of the IGRA is to "shield [Indian tribes] from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players." 25 U.S.C. § 2702(2).

In defining class II gaming so as to exclude all house banking games, the NIGC attempted to accommodate these competing policies. By allowing tribes to operate games which meet the definition of "bingo" but do not constitute house banking games, the NIGC is promoting the policies of tribal economic development and self-sufficiency. By drawing the line for class II gaming at house banking games, the NIGC is promoting the policy of protecting Indian tribes from outside corrupting influences, such as organized crime, and ensuring the Indian tribes are the primary beneficiaries of the gaming they conduct. Furthermore, the NIGC arrived at its rule after a sixty-day comment period and five public hearings held across the country. *See* Notice of Public Hearings, 56 Fed.Reg. 56,282–01 (1991). The preamble to the final rules reveal that the NIGC engaged in a "detailed and reasoned" consideration of legislative intent and the issues raised during the comment period. *See* Preamble to Final Rules, 57 Fed.Reg. 12,382–01 (1992) (to be codified at 25 C.F.R. part 502).

The NIGC gives meaning to the word "similar" in interpreting the IGRA phrase "games similar to bingo." The definition of bingo promulgated by the NIGC under 25 C.F.R. § 502.3 includes more than the classic definition of bingo. The NIGC definition of "games similar to bingo" does not require the card used to bear five adjacent horizontal rows of squares with five squares in each row, nor does it require that the letters "B–I–N–G–O" appear across the top of the card, even though these requirements are characteristic of the classic definition of bingo. All the NIGC definition of "games similar to bingo" requires is that the game not be a house banking game, that the game be played on cards bearing numbers or other designations, that the players cover the designations on the cards when such designations are randomly picked, and that the game be won by the first person covering a previously designated arrangement on the card. 25 C.F.R. § 502.3. The NIGC stated that games such as u-pickem, speed bingo, and nonbanking French bingo, among others, are included in the definition of "games similar to bingo." 57 Fed.Reg. 12387.

The tribe also argues that the NIGC relied on "trivial, almost meaningless distinctions, between keno and bingo" in classifying keno as a class III game. This Court does not find that the fact that the house has an interest in the outcome of a keno game, whereas it does not in a bingo game, is a meaningless distinction. Whether the house will win or lose in a given keno game is not predetermined, although the odds favor the house. There is, therefore, great incentive and opportunity for corrupting influences in keno which are absent in bingo. The expressed congressional desire to protect Indian tribes from outside corrupting forces is support enough for finding the distinction between keno and bingo to be meaningful. *See* S.Rep. No. 446, 100th Cong., Sess. 9 (1988) *reprinted in* U.S.C.C.A.N. 3071–3106 (reiterating several times the fear of legislators that Indian tribes involved in gaming would be infiltrated by criminal elements).

Finally, the tribe argues that the NIGC failed to interpret the ambiguity in the IGRA in favor of Indian tribes. It is true that statutes passed for the benefit of Indian tribes are to be liberally construed in favor of the tribes. *Bryan v. Itasca County*, 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976); and *United States v. Sisseton–Wahpeton Sioux Tribe*, 897 F.2d 358, 366–67 (8th Cir.1990). However, construing the IGRA so as to protect Indian tribes from the influences of organized crime and other corruption *is* a construction in favor of Indian tribes. Furthermore, it is in accord with Congress's expressed purpose for the IGRA, 25 U.S.C. § 2702(2), which intent is controlling.

## CONCLUSION

The issue presented by the tribe's request for declaratory judgment as to the game of pick bingo lacks ripeness. The tribe may pursue an advisory opinion from the National Indian Gaming Commission if it desires a declaration as to the status of this game.

The issue presented by the tribe's request for declaratory judgment as to the NIGC regulations is ripe. This Court finds these regulations to be reasonable interpretations of the Indian Gaming Regulatory Act and accordingly upholds them. Summary judgment is granted for the government on the issue of the validity of the NIGC regulations and the tribe's claim as to pick bingo is dismissed in accordance with the Order of this Court entered this same day.