**NUCOR CORPORATION,**
Plaintiff–Appellee,

v.

**ACEROS Y MAQUILAS DE OCCIDENTE, S.A. DE C.V.,**
Defendant–Appellant.

No. 93–1712.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 3, 1993.

Decided June 24, 1994.

Robert D. MacGill, David F. Hamilton (argued), Andrew J. Detherage, Barnes & Thornburg, Indianapolis, IN, for plaintiff-appellee.

Richard C. Arroyo (argued), Miguel A. Saldana, Brownsville, TX, for defendant-appellant.

Before LAY,* RIPPLE and MANION, Circuit Judges.

RIPPLE, Circuit Judge.

NUCOR Corporation ("NUCOR") filed a diversity action seeking declaratory relief against Aceros Y Maquilas de Occidente, S.A. de C.V. ("Aceros") and United Steel Corporation ("United"). The district court granted NUCOR's motion for summary judgment. Aceros has appealed that decision. For the

---

* The Honorable Donald P. Lay, of the United States Court of Appeals for the Eighth Circuit, is sitting by designation.

reasons stated below, we affirm the judgment of the district court.

# I

## BACKGROUND

### A. *Facts*

NUCOR filed its complaint for declaratory relief on July 26, 1991 to clarify the contractual relationship among three businesses: NUCOR, a Delaware corporation that manufactures steel in Crawfordsville, Indiana; Aceros, a Mexican corporation that buys, sells, and processes steel; and United, a Texas corporation that buys steel and sells it for export.[1]

In 1991, when Aceros was planning to purchase secondary steel at lower-than-prime prices, Humberto Batiz Rivas ("Batiz"), general manager of Aceros, asked the president of United, Joseph Diaz, to help him locate such steel. After a search, Diaz found that secondary steel was available at NUCOR's Crawfordsville plant. However, NUCOR's sales manager at that plant, James Clinger, told Diaz that he was not interested in selling the steel directly to Aceros, but that he would sell it to United. After Diaz had conversations with Mark Palmer, NUCOR's general manager, and other personnel at the Crawfordsville plant, he and Aceros' Batiz visited the NUCOR plant to view the steel and to discuss the purchase.

During the discussions at the plant on March 6, 1991, Diaz, Batiz, and Clinger considered the quantity of secondary steel to be purchased, the quality specifications, gauges, coil sizes, shipping, and credit terms. They did not discuss specific price terms. Moreover, NUCOR made it clear that it would sell and quote prices only to United, and that United could then sell to Aceros. The parties disputed whether NUCOR had agreed to fill United's order as soon as it received Aceros' "acceptable" line of credit; however, it is clear that there was no written agreement memorializing a sale that day in Crawfordsville.

On March 7, 1991, in United's Houston office, Batiz and Diaz signed a contract stating that United would sell secondary steel to Aceros. The next day United sent a purchase order to NUCOR for the same quantity and quality of secondary steel, but with different terms on price, shipping, and method of payment. On April 2, 1991, United sent NUCOR a transferable letter of credit that Aceros had executed. The parties disagreed about NUCOR's reaction to the letter of credit: United's Diaz reported that NUCOR's credit manager Cindy Beardsley "accepted" the letter and told him that NUCOR would ship the steel. NUCOR, on the other hand, said that, after receiving the letter, it followed up with further communications with United concerning the letter's adequacy and possible shipping terms. According to NUCOR, they also discussed whether NUCOR would actually fill United's order.

On April 22, 1991, United's president called NUCOR general manager Mark Palmer to ask why there was a delay in shipment. Palmer told him that there were problems with the letter of credit. When no steel had been delivered by May 20, 1991, Aceros general manager Batiz called Palmer to inquire about the delay. Batiz reported that Palmer told him that the letter of credit was acceptable and that NUCOR had been trying to ship the steel.

On June 5, 1991, NUCOR received notice that Aceros had canceled the letter of credit. As a result, on June 11, 1991, NUCOR general manager Palmer wrote United's Diaz and stated that United's order, lacking adequate credit support, would be treated as canceled. Shortly thereafter, Aceros general manager Batiz sent United a letter, dated June 17, 1991, stating that United had represented to Aceros that it had authority to bind NUCOR, that NUCOR was bound to the March 7 agreement between United and Aceros, and that NUCOR had failed to perform the contract. It demanded payment of $658,000 in damages within 60 days; failure to comply would lead to litigation under the Texas Deceptive Trade Practices Act ("DTPA"). Instead of responding to that demand, however, NUCOR filed this action for declaratory judgment on July 26, 1991.

---

1. United was a party to the litigation before the district court, but is not a party to this appeal.

## B. *Procedural History*

NUCOR sought a declaratory judgment that (a) NUCOR had no contractual obligations to Aceros or United Steel as a result of any negotiations with those parties about any proposed sale of steel; (b) United Steel was not an agent of NUCOR with authority to bind NUCOR to a contract for the sale of steel; and (c) NUCOR was not subject to and had not violated the Texas DTPA in its dealings with Aceros and United Steel. Order of Feb. 23, 1993, at 5.

The district court first determined that Indiana law governed each of NUCOR's three claims. Following *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), the district court applied the law of Indiana, the state within which it sits. It therefore looked to Indiana's choice of law rules to determine which state's law governs. In contract actions, the court found, Indiana follows the "most intimate contacts" or "center of gravity" test. *W.H. Barber Co. v. Hughes*, 223 Ind. 570, 63 N.E.2d 417 (1945). It then determined that, because all negotiations and representations upon which Aceros based its claims against NUCOR occurred in Indiana, and the steel at issue was in Indiana, the substantive law of Indiana must govern the merits of the litigation. Order of Feb. 23, 1993, at 8–10.

The court then found that NUCOR was not liable to Aceros under the March 7, 1991 contract. *Id.* at 20. A contract between Aceros and United would bind NUCOR, it stated, only if United had authority to bind NUCOR. Since NUCOR's sales manager Clinger and United's general manager Diaz denied there was an actual agency relationship, and there was no evidence of one, the court concluded that the only issue remaining was whether United had apparent authority to bind NUCOR. Following Indiana caselaw, the court found that, in this case, it was not reasonable to conclude that United had apparent authority to act on NUCOR's behalf. No one at the NUCOR plant in Crawfordsville told Batiz, directly or indirectly, that United had such authority when the March 7, 1991 contract was executed. Furthermore, Batiz testified that he clearly understood that NUCOR would sell to United and that United would then sell to Aceros in a separate transaction. *Id.* at 17–20.

The district court also found that NUCOR was not liable as a result of the March 6, 1991 meeting. The negotiations at that meeting concerned the sale of secondary steel, which qualifies as "goods" under Indiana Code § 26–1–2–105(1). Because the minimum value of that sale would have exceeded $500, the UCC's statute of frauds applies to the transaction. The statute requires that the contract be in writing, state a quantity, and be signed by an authorized NUCOR employee. The court found that these written requirements were simply not met. *Id.* at 21. The court examined the May 21, 1991 letter from NUCOR comptroller Tracy Shellabarger to United's Diaz[2] and United's March 8, 1991 purchase order sent to NUCOR[3] to determine whether the two could be read together to constitute a "writing" signed by a NUCOR agent. The court found that those documents reflected an agreement between NUCOR and United, but did not evidence a contract between NUCOR and Aceros. *Id.* at 23. After finding that Aceros could not rely upon promissory estoppel in opposing NUCOR's motion because it did not raise the issue in its answer, *id.* at 24–26, and that Aceros could not bring a DTPA claim under Texas law because Indiana law governed this action, *id.* at 26–27, the court granted summary judgment in favor of NUCOR. *Id.* at 28. It declared

---

**2.** The May 21, 1991 letter from NUCOR comptroller Tracy Shellabarger to Diaz stated in part: "You chose for us to ship under the Aceros Y Maquilas order first and I agreed. As of this writing we have not been able to ship under the Aceros order due to the specific size and grade specifications. However, you subsequently requested we ship the Abinsa S.A. order instead of the Aceros order. While we do have some quantities accumulated for the Abinsa order, we do not have sufficient quantities to fulfill the shipping terms of a full rail car." *See* R.27, Exh. 19.

**3.** The purchase order listed the seller as NUCOR, the buyer as United, and consignee as Aceros. The order was signed only by the president of United, Joseph Diaz.

that NUCOR had no obligation to Aceros or to United under contract or agency law, or under the Texas DTPA.

## II

## ANALYSIS

### A. *Declaratory Judgment Act*

#### 1.

■ We begin by considering the district court's decision to entertain the merits of NUCOR's declaratory judgment claim.[4] The district court's authority to decide an action seeking declaratory judgment arises under the Declaratory Judgment Act, 28 U.S.C. § 2201 (1986).[5] Its purpose "is 'to avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication, without waiting until his adversary should see fit to begin suit, after damage had accrued.'" *Cunningham Bros., Inc. v. Bail*, 407 F.2d 1165, 1167 (7th Cir.), *cert. denied*, 395 U.S. 959, 89 S.Ct. 2100, 23 L.Ed.2d 745 (1969) (quoting *E. Edelmann & Co. v. Triple–A Specialty Co.*, 88 F.2d 852,

854 (7th Cir.), *cert. denied*, 300 U.S. 680, 57 S.Ct. 673, 81 L.Ed. 884 (1937)). Under the Act, however, a district court ought not grant declaratory relief unless there is an actual, "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941), *quoted in Oneida Tribe of Indians v. State of Wisconsin*, 951 F.2d 757, 760 (7th Cir.1991). The decision of the district court to grant declaratory relief is discretionary. *Reno v. Catholic Social Servs., Inc.*, — U.S. —, —, 113 S.Ct. 2485, 2495, 125 L.Ed.2d 38 (1993) (citing *Abbott Lab. v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967)); *Deveraux v. City of Chicago*, 14 F.3d 328, 330 (7th Cir. 1994). "[A] suit for declaratory judgment aimed solely at wresting the choice of forum from the 'natural' plaintiff will normally be dismissed and the case allowed to proceed in the usual way." *Allendale Mut. Ins. Co. v.*

---

**4.** This circuit has joined the majority of circuits in holding that appellate court review of the decision to grant declaratory relief is governed by the de novo standard of review:

> [T]he decision whether to allow a declaratory judgment action to proceed is one which calls for "discretion hardened by experience into rule." In order to achieve this, appellate courts must be able to review decisions of the district courts de novo.

*Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.*, 819 F.2d 746, 749 (7th Cir.1987) (citation omitted); *see also Sears, Roebuck & Co. v. American Mut. Liab. Ins. Co.*, 372 F.2d 435, 438 (7th Cir. 1967) (stating that an appellate court may substitute its own judgment for that of the trial court). We note that the Fourth Circuit, in *Charter Federal Sav. Bank v. O.T.S.*, 976 F.2d 203 (4th Cir. 1992), *cert. denied*, — U.S. —, 113 S.Ct. 1643, 123 L.Ed.2d 265 (1993), recognized the varying standards of review applied to a district court's exercise of jurisdiction in declaratory judgment actions. It chose to follow the majority of circuits that review such decisions de novo, and invited a comparison of those decisions adopting the de novo standard, *see Cincinnati Ins. Co. v. Holbrook*, 867 F.2d 1330, 1333 (11th Cir.1989); *Fireman's Fund Ins. Co. v. Ignacio*, 860 F.2d 353, 354 (9th Cir.1988); *Tempco*, 819 F.2d at 748; and *Beacon Constr. Co., Inc. v. Matco Elec. Co.*, 521 F.2d 392, 397 (2d Cir.1975), with those using some level of discretion in its review, *see El Dia, Inc. v. Hernandez Colon*, 963 F.2d 488, 492

(1st Cir.1992); *Mission Ins. Co. v. Puritan Fashions Corp.*, 706 F.2d 599, 601 n. 2 (5th Cir.1983); and *Exxon Corp. v. F.T.C.*, 588 F.2d 895, 900 (3d Cir.1978). *Id.* at 208 & n. 8.

On at least one occasion, we have characterized the district court's decision not to entertain a declaratory judgment action filed in anticipation of the filing of a suit in state court as a decision to abstain and therefore as subject to review under the abuse of discretion standard. *See A.G. Edwards & Sons v. Public Bldg. Comm'n*, 921 F.2d 118, 121 (7th Cir.1990).

This ambiguity with respect to the appropriate standard has been exacerbated by the Supreme Court's recent recital, without discussion, of the deferential standard of review in *Cardinal Chem. Co. v. Morton Int'l, Inc.*, — U.S. —, —, 113 S.Ct. 1967, 1978, 124 L.Ed.2d 1 (1993).

We need not decide the matter definitively in this case because, under either standard, the result is the same.

**5.** The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides:

> In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

*Bull Data Sys., Inc.*, 10 F.3d 425, 431 (7th Cir.1993) (citing *Tempco*, 819 F.2d at 747). But if the declaratory judgment will clarify and settle the disputed legal relationships and afford relief from the uncertainty and controversy that created the issues, it is usually resolved rather than dismissed. *Tempco*, 819 F.2d at 749 (citing Edwin Borchard, *Declaratory Judgments* 299 (2d ed. 1941) (stating the purposes of declaratory judgments)).

### 2.

■ Aceros contends that the district court erred in exercising its jurisdiction under the Declaratory Judgment Act. By denying dismissal of NUCOR's complaint, claims Aceros, the court allowed NUCOR to use the Declaratory Judgment Act as a weapon to frustrate the lawsuit that Aceros was prepared to file in Texas. The "notice letter" Aceros sent to NUCOR and to United on June 17, 1991, described NUCOR's breach of contract and announced that litigation under the Texas DTPA would ensue within sixty days if NUCOR did not pay Aceros' damages. Before the sixty-day period had expired, NUCOR filed the declaratory action, thereby depriving Aceros of its opportunity to file suit in the forum of its choice.

The district court considered this challenge in its Order of March 19, 1992, which denied Aceros' motion to dismiss the action. The court found, however, that Aceros had not filed suit; it had simply sent a "notice letter." It disagreed with Aceros' characterization of that notice letter as the equivalent to the

filing of a suit. It also criticized Aceros' attempt to justify its position by quoting a portion of a section of the implementing legislation related to the Texas DTPA.[6] After pointing out Aceros' deliberately selective deletion of pertinent segments of the statute in order to alter the plain meaning of that section to its benefit, the court characterized Aceros' action, in a very understated reprimand in a footnote, as "hardly" a good faith act, and ruled that Aceros did not support its claim that it had filed suit in Texas. The court then concluded that a declaratory judgment was an appropriate method for deciding the legal relationships among the parties:

> Here, another lawsuit between the parties involving identical issues has not been filed; yet, Aceros has clearly threatened suit against Nucor. Aceros' claim has ripened to a point where it could invoke a coercive remedy, but it has not done so. Aceros' assertion that it plans to bring suit is not enough. As memories fade, the facts become more difficult to determine. Accordingly, Nucor would be prejudiced by any delay. Nucor need not wait for Aceros to bring a coercive action. Aceros' motion to dismiss is DENIED.

Order of 19 March, 1992, at 14 (citing *Tempco*, 819 F.2d at 749). We are in full agreement with the district court's analysis. First, we agree that the dispute clearly presented a ripe controversy. Once Aceros sent its notice letter of June 17, 1991, the disagreement was no longer an abstract question. Moreover, the legal issues presented

---

**6.** Aceros selectively quoted § 6 of the implementing legislation which added amendments to § 17.505 of the Texas Deceptive Trade Practices Act:

> (c) In an action, claim, or suit in which a statute requires written notice to be given before the filing or bringing of an action, claim, or suit, personally delivering or depositing the notice, postage prepaid, *in the United States Mail before the effective date of this Act* is considered filing or bringing the action, if the suit is formally filed or otherwise brought within 120 days after the date of the delivery or mailing.

However, the full text of § 6, with the omitted language italicized below, makes clear that paragraph (c) merely *sets forth a procedure for determining whether the 1989 amendments to § 17.505 apply to a particular action:*

> (a) This Act applies to all actions or claims commenced on or after the effective date of this Act.
> (b) An action or claim commenced before the effective date of this Act is governed with respect to the specific subject matters of this Act by the applicable law in effect for the effective date of this Act, in that prior law is continued in effect only for that purpose.
> (c) In an action, claim, or suit in which a statute requires written notice to be given before the filing or bringing of an action, claim, or suit, personally delivering or depositing the notice, postage prepaid, *in the United States Mail before the effective date of this Act* is considered filing or bringing the action, if the suit is formally filed or otherwise brought within 120 days of the delivery or mailing.

are ones "the resolution of which would be essentially unaffected by further factual development." *Government Suppliers Consolidating Servs. v. Bayh*, 975 F.2d 1267, 1275 (7th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 977, 122 L.Ed.2d 131 (1993) (quoting *Peick v. Pension Benefit Guar. Corp.*, 724 F.2d 1247, 1261 (7th Cir.1983), *cert. denied*, 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984)).

Our review of the record on appeal affirms our belief that the district court properly exercised its judicial discretion in order to hear the case. Our precedent teaches that the "standards generally to be applied in exercising discretion to hear a declaratory judgment action are whether a declaratory judgment will settle the particular controversy and clarify the legal relations in issue." *Sears, Roebuck*, 372 F.2d at 438. Our colleagues in the Sixth Circuit, drawing heavily on the Supreme Court's decision in *Green v. Mansour*, 474 U.S. 64, 72–73, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985), have approached their review of this issue by addressing five considerations:

> (1) whether the judgment would settle the controversy;
>
> (2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue;
>
> (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for *res judicata*";
>
> (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach on state jurisdiction, and
>
> (5) whether there is an alternative remedy that is better or more effective.

*Nationwide Mut. Fire Ins. Co. v. Willenbrink*, 924 F.2d 104, 105 (6th Cir.1991) (citations omitted); *see also* James W. Moore & Jo Desha Lucas, 6A *Moore's Federal Practice* ¶ 57.08[3]–[7] (2d ed. 1994).

In this case the judgment settled a ripe dispute between two of the three parties involved. The allowance of the action relieved NUCOR's uncertainty and insecurity concerning its legal relationship with Aceros. *See Cunningham Bros.*, 407 F.2d at 1168;

*Tempco*, 819 F.2d at 749 (citing Borchard, *Declaratory Judgments* 299 (2d ed. 1941)). The judgment would serve the useful purpose of settling the contractual relationships. In Aceros' view, the district court has condoned a "race to the courthouse." It claims that NUCOR's declaratory action preempted its state court action in Texas and subverted the legislative intent and public policy behind the notice letter delay period established by Texas law, a period meant to encourage settlement. The force of this argument is somewhat muted by the fact that Aceros waited until March 1992, eight months after the filing of this declaratory judgment action, before it filed its state court action. There simply was no race to the courthouse. Aceros presented no evidence that the DTPA action would be a better remedy, or that the declaratory action was being used merely for procedural fencing. There is no reason to disturb the district court's decision to adjudicate the claim for declaratory relief.

### B. *Personal Jurisdiction*

The district court held that it had personal jurisdiction over Aceros. It found that Aceros' claims against NUCOR arose from the meeting in Crawfordsville, Indiana, and concluded that, because Aceros purposefully conducted that business in Indiana, Indiana courts may exercise jurisdiction over any claims resulting from the meeting. Order of March 19, 1992, at 9.

Aceros objects to the district court's determination of personal jurisdiction on the ground that there are insufficient minimum contacts in Indiana to confer jurisdiction. It asserts that the only contact with the state of Indiana was the meeting at NUCOR's plant in Crawfordsville that the three parties attended. However, there was no contract entered into at the time. In fact, NUCOR made clear to Aceros at that meeting that it would not deal with Aceros except through United.

■ A federal district court exercising diversity jurisdiction has personal jurisdiction over a nonresident defendant "only if a court of the state in which it sits would have such jurisdiction." *Wilson v. Humphreys (Cay-*

*man) Ltd.,* 916 F.2d 1239, 1243 (7th Cir. 1990), *cert. denied,* 499 U.S. 947, 111 S.Ct. 1415, 113 L.Ed.2d 468 (1991) (quoting *Turnock v. Cope,* 816 F.2d 332, 334 (7th Cir. 1987)). In *Wilson,* our circuit explained the two-step procedure traditionally employed when determining whether a state court would have jurisdiction over a nonresident defendant:

> [R]eview of decisions regarding jurisdiction of a federal court in a diversity suit requires a two-part inquiry:
>
> (1) whether the state statute allows jurisdiction, and
>
> (2) whether the assertion of jurisdiction complies with constitutional due process standards. In this case, these twin inquiries collapse into one, because, as this court has noted, Indiana's long-arm statute extends personal jurisdiction to the limit allowed under the due process clause of the fourteenth amendment.

*Wilson,* 916 F.2d at 1243 (citations omitted). We therefore consider whether assertion of jurisdiction in this case violates due process.

The due process analysis set forth in *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), requires that a nonresident defendant have "minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* at 316, 66 S.Ct. at 158 (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)). The sufficiency of those contacts is measured by the defendant's purposeful acts:

> Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant *himself* that create a "substantial connection" with the forum State. Thus where the defendant "deliberately" has engaged in significant activities within a State, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

*Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475–76, 105 S.Ct. 2174, 2183–84, 85 L.Ed.2d 528 (1985) (citations omitted).

■ When a defendant like Aceros does not conduct business generally in the forum state but has transacted some business there, the defendant can be subject to suit, under the state's long-arm statute, on causes of action arising from the business transaction conducted in the state. In that circumstance he is considered subject to the specific, rather than the general, jurisdiction of the state's courts. 4 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1069 (1987) at 357–58; *see also Helicopteros Nacionales de Colombia, S. A. v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 1872 n. 8, 80 L.Ed.2d 404 (1984) (stating that the State exercises "specific jurisdiction" over a defendant when the suit arises out of or is related to the defendant's contacts with the forum). After a broad survey of the Supreme Court and circuit caselaw concerning the criteria required to satisfy the assertion of specific jurisdiction, we stated in *Wilson* that such jurisdiction would comport with due process only if the defendant "reasonably should have anticipated 'being haled into court' in Indiana" and "purposefully ... availed itself of the 'privilege of conducting activities' in Indiana." *Wilson,* 916 F.2d at 1244 (quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980), and *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958)). In determining whether specific jurisdiction should be asserted over the defendant, the court should assess the relationship among the defendant, the forum, and the litigation. *Id.* (citing cases).

■ The relationship among Aceros, the state of Indiana, and this suit brought by NUCOR was established at the meeting in Crawfordsville, Indiana. After prior telephone negotiations had increased their interest, Aceros' general manager and the president of United came to discuss in detail the purchase of secondary steel with NUCOR's sales manager at the Crawfordsville plant. By its conduct Aceros had purposefully

availed itself of the privilege of conducting business in Indiana; by that same conduct it invoked the benefits and protections of the laws of Indiana. *See Hanson,* 357 U.S. at 253, 78 S.Ct. at 1239; *Wilson,* 916 F.2d at 1244. This circuit and others have found that a defendant's participation in substantial preliminary negotiations conducted in the forum state leading to the contract in issue is a sufficient basis for personal jurisdiction. *See Deluxe Ice Cream Co. v. R.C.H. Tool Corp.,* 726 F.2d 1209, 1215–16 (7th Cir.1984) (holding that discussions in Illinois leading to contract created jurisdiction in Illinois); *Nieman v. Rudolf Wolff & Co.,* 619 F.2d 1189, 1193 (7th Cir.) (holding that lunch meeting in Illinois on terms of contract sufficient for specific jurisdiction), *cert. denied,* 449 U.S. 920, 101 S.Ct. 319, 66 L.Ed.2d 148 (1980); *see also Rainbow Travel Serv., Inc. v. Hilton Hotels Corp.,* 896 F.2d 1233, 1238 (10th Cir. 1990) (finding sufficient contacts when hotel solicited business, carried out negotiations and sent contracts to forum state); *Thompson v. Ecological Science Corp.,* 421 F.2d 467, 469 (8th Cir.1970) (finding that conference and negotiations leading to execution of contract created jurisdiction in Arkansas); *Liquid Carriers Corp. v. American Marine Corp.,* 375 F.2d 951, 953–54 (2d Cir.1967) (finding that trips to New York for negotiation established jurisdiction in New York).[7] The district court followed the same *Wilson* analysis. We, like the district court, are convinced that the contacts Aceros had with the state of Indiana were the result of purposeful conduct in Indiana. Therefore they were sufficient to satisfy the assertion of specific jurisdiction over Aceros in Indiana.

### C. Choice of Law

The district court rejected Aceros' contention that Texas law governed the issues before it, and instead applied the law of Indiana to NUCOR's claims. Aceros now challenges that choice of law before this court.

■ When the jurisdiction of a district court is based on diversity of citizenship, the court must apply the substantive law of the forum in which it sits. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). "If the laws of more than one jurisdiction arguably are in issue, *Erie* also requires a federal court to apply that state's choice of law rules." *Jean v. Dugan,* 20 F.3d 255, 260–61 (7th Cir.1994) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *Horn v. Transcon Lines, Inc.,* 7 F.3d 1305, 1307 (7th Cir. 1993)).[8] The district court, sitting in Indiana, properly applied Indiana's choice of law rules.

■ This action was based on an alleged contract with no provision stating the law that would control the relationship of the parties. In Indiana, the test used to determine which state's law governs a contract action is the "most intimate contacts" or "most significant relationship" test. Established by the Supreme Court of Indiana in *W.H. Barber Co. v. Hughes,* 223 Ind. 570, 63 N.E.2d 417, 423 (1945), the test requires that a court analyze "all acts of the parties touching the transaction in relation to the several states involved" and apply "the law of that state with which the facts are in most intimate contact." *Id.; see also Dohm & Nelke v. Wilson Foods Corp.,* 531 N.E.2d 512, 513 (Ind.App.1988) (applying the *Barber* "most intimate contacts" test to its facts); *Hubbard Mfg. Co. v. Greeson,* 515 N.E.2d 1071, 1073 (Ind.1987) (explaining Indiana choice-of-law rules for contracts and torts).

■ The district court determined that Indiana clearly had the most intimate contacts with the events between NUCOR and Aceros. NUCOR's complaint concerns an alleged contract for the purchase of secondary steel arising out of the negotiations of March 6, 1991. The undisputed facts reveal

---

7. Indiana courts have also found personal jurisdiction based upon a nonresident defendant's business negotiations conducted within this state. *See, e.g., Freemond v. Somma,* 611 N.E.2d 684, 690 (Ind.App.1993); *Tietloff v. Lift-A-Loft Corp.,* 441 N.E.2d 986, 991 (Ind.App.1982); *Suyemasa v. Myers,* 420 N.E.2d 1334, 1342 (Ind.App.1981).

8. We review a district court's choice of law de novo. *Salve Regina College v. Russell,* 499 U.S. 225, 238, 111 S.Ct. 1217, 1224–25, 113 L.Ed.2d 190 (1991).

that all the discussions between Aceros and NUCOR occurred in Indiana at NUCOR's Crawfordsville plant. Aceros' general manager Batiz so testified; he also stated that no written contract was drawn up during those discussions in Crawfordsville.[9] Clearly the relevant contacts between Aceros and NUCOR occurred in Indiana. The contacts in Texas to which Aceros refers were all relevant only to the relationship either between Aceros and United or between United and NUCOR. For example, NUCOR quoted the price of the steel to United, not to Aceros, in Texas, and the contract that was drawn up in Texas was between United and Aceros.[10] Because the focal point of any claimed contractual relationship between Aceros and NUCOR was found in the Crawfordsville negotiations, we agree with the district court's determination that the other occurrences are less significant. Therefore, we conclude that the district court correctly applied Indiana law to NUCOR's contract-based claim.

■■■■■ One factor that would change the focal point of the relationship is a showing that United was the agent of NUCOR, with apparent authority to act on NUCOR's behalf. Because Aceros so contended, the district court considered which law to follow when determining agency or apparent authority. The court found no established test in Indiana for choosing the appropriate law with respect to issues of agency. It therefore followed the approach taken by the *Restatement (Second) of Conflict of Laws* §§ 291 & 292 (1971), which stated that the governing law is that of the forum with the "most significant relationship to the parties and the transaction."

[A]n agency relationship may exist even though there is no contract between the parties and even though the agent is not to receive compensation. When the agency relationship is created otherwise than by contract, the obligations of the principal and agent to each other are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the parties and the transaction. This state is selected by a process essentially similar to that employed in the case of a contract.

*Restatement* § 291, at 268; *see also* § 292 (stating that the same "significant relationship" test is used to determine whether a principal is bound by action taken on his behalf by an agent in dealing with a third person). The district court followed the factors listed in § 188 of the *Restatement* for determining the applicable law when the parties have not made an effective choice of law: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter; and (5) the residence, place of business, or place of incorporation of the parties. *Restatement* § 188, at 575.[11] It found that two factors clearly favored application of Indiana law: The Crawfordsville plant was the place of negotiation and the location of the subject matter, the steel. It found that two factors were neutral: the place where the alleged agreement was entered (probably Indiana, although Texas or both places could be claimed), and the location of the parties (Indiana, Texas and Mexico). The place of performance could be considered Texas, because Diaz and Batiz signed the contract between themselves in Texas and the steel

9. In his deposition Batiz stated: "We did negotiate terms but it wasn't under a contract. So I [was] just relying on what we spoke with Mr. James Clinger.... Nothing written. I told you before. I was just relying on what we talked about. There was nothing written." R.29 at 85.

10. Aceros argues that NUCOR's representative neither quoted Aceros a price nor took an order for steel in Indiana. The emphasis made by Aceros is the location of those two transactions. The pivotal undisputed fact, however, is that NUCOR did not quote *Aceros* a price at all; nor did it take *Aceros'* order anywhere or at any time. NUCOR quoted *United* a price and took *United's* order for steel in Texas. The most intimate,

indeed only, contacts between NUCOR and Aceros took place in Indiana—their March 6 meeting and the May 20 telephone conversation placed by Mr. Batiz to NUCOR's general manager Mark Palmer to find out why no delivery had been made.

11. The district court noted that the Seventh Circuit had followed the Restatement's approach with respect to Illinois law, *P.S. & E., Inc. v. Selastomer Detroit, Inc.*, 470 F.2d 125, 127 (7th Cir.1972); it thus believed that the same approach would be adopted by the Supreme Court of Indiana.

was to be shipped there. The district court's analysis of these contacts led it to conclude that Indiana had the most significant relationship to the parties and the agency, and therefore that Indiana law should govern the agency issues.

■ We agree with this analysis. According to an authoritative treatise on conflicts, the choice-of-law approach adopted by the state of Indiana has been that of the Restatement (Second) of Conflict of Laws. Eugene F. Scoles & Peter Hay, *Conflict of Laws* § 18.21, at 693 (2d ed. 1992). The Second Restatement offers a provision that can be adapted to areas for which particularized rules have not yet been developed. The sections of the Second Restatement that apply to an agency relationship are §§ 291 and 292:

> Section 291 provides that the relationship of principal and agent (the internal relationship) is governed by the place of the most significant relationship, with cross-reference to §§ 187–88. The external relationship—that between principal and third party—is also to be governed by the law of the most significant relationship (§ 292), except that the local law of the agent's place of acting will validate his act if the principal had authorized him to act in that state or had led the third party to believe that the agent had authority. No provision is made for the agent's contract with the third party and the rights and liabilities arising from it for them *inter se*. Consequently, and essentially no different from § 291, these questions are left to the general provisions of §§ 187–88.

*Id.* § 18.32[7], at 711. We agree, therefore, that the approach of the Second Restatement is appropriate in this case. Moreover, because Indiana's long-standing choice-of-law test for contract matters [12] is the "most sig-

nificant relationship"/"most intimate contracts" test, it is reasonable to adopt the same test when choosing the proper law in agency relationships that are tied to the alleged contract. As the district correctly analyzed, therefore, we conclude that Indiana is the state with the most significant relationship to the parties involved in both the alleged contract and agency relationships.[13]

### D. *Merits*

■ We review a grant of summary judgment de novo, drawing all reasonable inferences from the record in the light most favorable to the nonmoving party. *Jaurequi v. John Deere Co.*, 986 F.2d 170, 171 (7th Cir.1993). The granting of summary judgment must be affirmed when there is no genuine issue as to any material fact; moreover, the nonmovant's failure to establish an essential element of its case "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Aceros contends that, because there were issues of fact concerning agency, apparent authority, and promissory estoppel, the district court erred in granting summary judgment. It also submits that the district court erred in holding that the transaction did not comply with the statute of frauds. We shall address each assertion in turn.

### 1. Agency: actual or apparent authority

■ Actual authority to act on behalf of another requires three elements: (1) the principal's manifest consent to have the person act as its agent; (2) the agent's manifest consent to the arrangement; and (3) the principal's control over the agent's actions. *Medtech Corp. v. Indiana Ins. Co.*, 555 N.E.2d 844, 850 (Ind.App.1990).

---

12. *See Kolentus v. Avco Corp.*, 798 F.2d 949, 955 (7th Cir.1986), *cert. denied,* 479 U.S. 1032, 107 S.Ct. 878, 93 L.Ed.2d 832 (1987) (citing *W.H. Barber Co.*, 63 N.E.2d at 423). Indiana appellate courts have amplified the *Barber* choice-of-law rule by considering the Restatement § 188 factors for contraction actions. *See Dohm & Nelke,* 531 N.E.2d at 513; *Eby v. York Div., Borg–Warner,* 455 N.E.2d 623, 626 (Ind.App.1983).

13. The district court also held that Aceros' potential claim under the Texas DTPA, whether it be contractual or tortious in nature, would be governed by Indiana law. Order of February 23, 1993, at 16–17. It later recognized that, because the DTPA is a Texas statute with no parallel in Indiana law, the DTPA claim "is simply irrelevant to this action." *Id.* at 27. We agree. The DTPA is a state statute not within our purview in this appellate review of a declaratory judgment.

■ The district court concluded that "[t]he undisputed facts here show clearly that Nucor and United had no actual agency relationship, because neither Nucor nor United ever manifested consent to such a relationship, either expressly or impliedly." Order of February 23, 1993, at 18. Aceros insists that the undisputed facts show just the opposite: Even though NUCOR's manager Clinger stated that it would sell only to United, all the parties knew that Aceros was purchasing the steel; therefore NUCOR had designated United as its agent for dealing with Aceros. Aceros also posits that, despite the two separate orders, the evidence clearly showed that the parties negotiated one contract.

The record will not support Aceros' position. The deposition of United's president Diaz makes clear that United had no actual authority to act as an agent for NUCOR. According to Mr. Diaz's testimony, NUCOR never gave United authority to act as NUCOR's agent. Mr. Diaz also stated that he never told Mr. Batiz or any Aceros employee that United had authority to make contracts on behalf of NUCOR. Mr. Clinger, NUCOR's sales manager, confirmed that understanding in his affidavit. Therefore we hold that United was not acting as NUCOR's agent, and that Mr. Batiz had no reason to believe that United had actual authority to act as NUCOR's agent. Moreover, the evidence contradicting Aceros' single-contract argument includes the testimony of its own general manager Humberto Batiz. In his deposition, Mr. Batiz testified that he understood the planned buy-sell transaction: NUCOR would sell to United, and Aceros would then buy from United at a higher price in a separate transaction. R.29 at 34–35, 41. He confirmed, as well, that Aceros never entered into a contract with NUCOR.[14] The evidence clearly establishes, therefore, that the purchase orders were exchanged in separate transactions.

14. Batiz testified:
Q: Did Aceros ever enter into a written, binding contract with NUCOR Corporation for the purchase of steel?
A: Never.

■ Nor was it reasonable to believe that United had apparent authority to act as NUCOR's agent. The Indiana Supreme Court explained apparent authority in *Pepkowski v. Life of Indiana Ins. Co.*, 535 N.E.2d 1164 (Ind.1989).

> Apparent authority is the authority that a third person reasonably believes an agent to possess because of some manifestation from his principal. The necessary manifestation is one made by the principal to a third party, who in turn is instilled with a reasonable belief that another individual is an agent of the principal.

*Id.* at 1166–67 (citations omitted). The key to the establishment of apparent authority is the source of the agency representation on which the third party (in this case, Aceros) relied:

> It is essential that there be some form of communication, direct or indirect, *by the principal,* which instills a reasonable belief in the mind of the third party. Statements or manifestations made by the agent are not sufficient to create an apparent relationship.

*Id.* at 1167 (citations omitted) (emphasis added); *see also Northern Assurance Co. v. Summers,* 17 F.3d 956, 962 (7th Cir.1994) (stating that manifestation of authority to issue insurance binder must come from principal); *Hayes v. Lincoln Gen. Ins. Co.,* 899 F.2d 684, 686–87 (7th Cir.1990) (holding that actions taken by agent employer, rather than the principal insurance company, were insufficient to establish the reasonable belief necessary for apparent authority).

■ The *sine qua non* of apparent agency in this case is a representation by NUCOR on which a reasonable person in Aceros' position would have relied. *Secon Serv. Sys. v. St. Joseph Bank and Trust,* 855 F.2d 406, 418 (7th Cir.1988) (applying earlier consonant Indiana law of apparent agency). There is no evidence that NUCOR made any representation to Aceros that might vest United with apparent authority to bargain on its

Q: Aceros' contract was with United Steel.
A: That's right, that's correct.
R.29 at 62; *see also* Findings of Undisputed Facts, R.48 at ¶ 17.

behalf. After a specific denial of an agency relationship by United and NUCOR, Aceros was required, in order to resist successfully summary judgment, to demonstrate that a genuine agency issue existed for trial.[15] Aceros failed to meet that burden. Aceros has provided no evidence—statement, act, or other manifestation made to it by NUCOR—of NUCOR's representations that would reasonably cause Aceros to believe that NUCOR gave United authority to act on behalf of NUCOR. Representations or acts of the agent cannot create apparent authority, *Pepkowski*, 535 N.E.2d at 1167, and Mr. Batiz's assumption that United had such authority is certainly not sufficient to bind NUCOR. We hold, therefore, that Aceros' claim of an agency relationship between NUCOR and United must fail.

## 2. Statute of frauds

The district court determined that NUCOR had no contractual obligations to Aceros as a result of its March 6, 1991 meeting. It concluded that, if there was a contract, it did not meet the requirements of the statute of frauds:[16] There was no writing "sufficient to indicate that a contract for sale has been made" which was signed by an employee or agent of NUCOR, "the party against whom enforcement is sought." Order of Feb. 23, 1993, at 21 (citing Ind.Code § 26–1–2–201(1)).

### a.

There can be no serious contention that Aceros can prevail in the face of the general statute of frauds provision. No authorized NUCOR representative signed the order sent to it by United, the only written evidence of that agreement. *See A–Abart Elec. Supply, Inc. v. Emerson Elec. Co.*, 956 F.2d 1399, 1403 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 194, 121 L.Ed.2d 137 (1992) (reviewing same statute of fraud provision under Illinois law). Aceros therefore claims that the purchase orders of March 7 and March 8, 1991—the first between itself and United and the second between United and NUCOR—constitute a contract between NUCOR and United which satisfies the "merchants' exception"[17] to the Statute of Frauds. Aceros argues that all the parties are merchants, and that Aceros was the beneficiary of the written orders, even though there were two separate purchase orders. Aceros also points out that it put up a letter of credit for the full cost of the steel, a letter that was accepted by NUCOR; Aceros therefore argues that it has satisfied the "payment made"[18] exception of the Statute of Frauds.

 Aceros cannot succeed in its arguments. We examine first the contention that the purchase orders satisfy the merchant's exception to the statute of frauds.

---

15. *Cf. Jarvis Drilling, Inc. v. Midwest Oil Producing Co.*, 626 N.E.2d 821, 826 (Ind.App.1993) ("[W]hen the moving party files affidavits or other evidence establishing the lack of a genuine issue of material fact, the burden shifts to the nonmoving party to demonstrate a genuine issue exists for trial.").

16. Indiana Code Annotated § 26–1–2–201 (West 1980 & Supp.1993) provides the formal requirements for the statute of frauds:

(1) Except as otherwise provided in this section, a contract for the sale of goods for the price of five hundred dollars ($500) or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon, but the contract is

not enforceable under this paragraph beyond the quantity of goods shown in such writing.

17. The "merchants' exception" provides:

Between merchants if within a reasonable time a writing in confirmation of the contract and sufficiently against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten (10) days after it is received.
Ind.Code § 26–1–2–201(2).

18. The "payment made" exception states:

[A] contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable:

. . . . .

(c) with respect to goods for which payment has been made and accepted or which have been received and accepted.

As a threshold matter, we point out that Aceros failed to raise the merchants' exception and payment-made exception theories before the district court. On appeal, a litigant is restricted to the arguments raised in district court.[19] Even if we were to venture beyond this formidable procedural barrier, Aceros would not prevail. The writings to which Aceros refers are *two* separate orders for secondary steel, one between NUCOR and United and one between United and Aceros; neither is between NUCOR and Aceros.[20] Moreover, neither order is a "writing *in confirmation of a contract*" that had been made previous to the order; thus, the merchants' exception does not apply. Ind. Code § 26–1–2–206(1)(b) (emphasis added); *see also R. S. Bennett & Co. v. Economy Mechanical Indus., Inc.*, 606 F.2d 182, 186 (7th Cir.1979) (finding that two letters to defendants were offers, not writings in confirmation of contract, because no previous agreement had been reached); *Triangle Marketing, Inc. v. Action Indus., Inc.*, 630 F.Supp. 1578, 1580 (N.D.Ill.1986) (finding that purchase order was not in confirmation of prior agreement).[21]

▮▮▮ Nor can Aceros rely on the letters of credit. NUCOR never accepted an actual payment for the steel as required under the "payment made" exception to the Statute of Frauds. Therefore, that exception does not apply. NUCOR could not draw on the letter

of credit established by Aceros "in favor of United Steel," and did not draw on United's letter of credit naming NUCOR as a beneficiary in order to establish credit for possible shipments to United. Evidence of actual acceptance of the payment "constitutes an unambiguous over admission by both parties that a contract actually exists." Ind.Code § 26–1–2–201, cmt. Payment made without acceptance of the payment is not sufficient. *Cf. Brenner v. Glosser*, 29 Ill.App.3d 395, 327 N.E.2d 87, 17 U.C.C.Rep.Serv. (Callaghan) 350, 352 (1975) (ruling that payment is not made and accepted within meaning of statute of frauds when funds are held by third party, like escrow agent). In fact, Mr. Batiz testified that Aceros did not transfer any funds to NUCOR, and that it received the full value of the letter of credit when it canceled the letter. R.29 at 95, 103. We hold that neither the requirements nor the exceptions to the Statute of Frauds have been satisfied in this case.

b.

▮▮▮ Aceros also contends that the Statute of Frauds was satisfied by reading together (1) the purchase order between Aceros and United, and (2) NUCOR's May 21 letter to United's president Diaz from comptroller Tracy Shellabarger, which stated: "You chose for us to ship under the Aceros y Maquilas order first and *I agreed*."[22] R.27,

---

Ind.Code § 26–1–2–201(3)(c).

19. "The rule in civil cases is that except with regard to jurisdictional issues and issues involving comity ... a ground not raised in the district court cannot be used to reverse that court." *Amcast Indus. Corp. v. Detrex Corp.*, 2 F.3d 746, 749 (7th Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 691, 126 L.Ed.2d 658 (1994); *see also Old Republic Ins. Co. v. Federal Crop Ins. Corp.*, 947 F.2d 269, 276–77 (7th Cir.1991) (recognizing "exceptional circumstances" as an exception to the general rule, as well). Although appellate courts have discretion to consider a question raised initially before them when injustice might otherwise result, *see Singleton v. Wulff*, 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), this circumstance hardly poses such a situation.

20. The document between United and Aceros is entitled "Confirmation No. 0391–02" and was signed by both parties. The document sent to NUCOR was entitled "Purchase Order No. 0391–02," and was signed only by United.

21. *See also Indiana Farm Bureau Co-op. Ass'n v. Ennis*, 574 N.E.2d 322, 324 (Ind.App.1991) (finding that the unsigned confirmation order, which was to be signed by seller and returned, was a fact that supported testimony denying that an agreement had been reached).

22. The May 21, 1991 letter from Comptroller Tracy L. Shellabarger to Mr. Diaz, President of United, states in full:

I am writing to confirm our telephone conversation of April 25, 1991 and to give you an order status. In April I told you we would accept only one of the two orders you had previously requested from us. I said that once we had made ourselves comfortable with the transferable letter of credit process, etc. we would consider accepting future orders. You chose for us to ship under the Aceros Y Maquilas order first and I agreed.
As of this writing we have not been able to ship under the Aceros order due to the specific size and grade specifications. However, you subse-

Exh. 19. According to Aceros, the letter clarifies that the real transaction is between Aceros and NUCOR, for whom the contract was in fact made.

The district court disagreed with that reading of the Shellabarger letter, and determined that the letter and purchase order could not be read together to comprise a contract between NUCOR and Aceros. In the district court's view, the documents reflected a relationship between NUCOR and United: They agreed that NUCOR would ship steel under "the Aceros order," nothing more. More importantly, the district court found that the letter rescinded the Aceros shipping order at United's request.

> However, Shellabarger also noted that United, after making this arrangement, "subsequently requested [shipment of] the Abinsa S.A. order *instead of the Aceros order.*" ... The Court reads this language as reciting a rescission of any agreement that may have existed for Nucor to ship "under" the Aceros order, and neither United nor Aceros have disputed this reading.

Order of Feb. 23, 1993, at 23–24.

We believe that the district court was correct in its reading of this letter. The letter discussed two orders made by United on behalf of its customers Abinsa and Aceros; United's request that NUCOR ship the Abinsa (rather than the Aceros) order first; and NUCOR's difficulties with the orders. The

letter gives an "order status" only. Rather than reflecting an agreement between the parties, it states that there will be further discussion. Nothing in the letter indicates that a contract had been formed between NUCOR and United—no terms are presented in the letter, no reference to another agreement presenting terms is incorporated—and no construction of the letter reasonably could suggest that a contract was contemplated between NUCOR and Aceros. *Cf. Ryan v. Wersi Elec. GmbH & Co.*, 3 F.3d 174, 180 (7th Cir.1993) (stating that, under Illinois law, "in order to raise a genuine issue of triable fact and foreclose summary judgment, the letter must be sufficiently certain to establish an intent to be bound and must 'express the substance of the contract with reasonable certainty.'") (citations omitted). We must conclude, therefore, that the combination of this signed letter and the unsigned purchase order sent by United simply cannot create a contractual agreement between NUCOR and Aceros.[23]

In order to defeat summary judgment, Aceros had the burden of proving a genuine issue of material fact: the existence of a contract between itself and NUCOR. Aceros has not met that burden. There is no such issue with respect to the direct dealings of the two firms. Nor is there such a question with respect to their dealings through United. The pertinent purchase order is likewise between NUCOR and United. The letter

---

quently requested we ship the Abinsa S.A. order instead of the Aceros order. While we do have some quantities accumulated for the Abinsa order, we do not have sufficient quantities to fulfill the shipping terms of a full rail car.

I discussed the lack of shipment activity with both Jim Clinger and Mark Palmer. They agreed that the primary problem is that your orders are very restrictive with regard to coil weights and the type of defect that is acceptable. They also reminded me that all secondary orders are on an "as accumulated" basis. Also, as you know from your conversations with Mark, we do not have the same level of secondary inventory that we did at the time of your visit in early March.

Joe, while I am sure these are not the answers you had hoped to hear, I hope this letter helps explain the status of things relating to your orders on the behalf of Aceros and Abinsa. I will call you this morning after you have re-

ceived a facsimile of this letter to discuss it's [sic] contents with you further.

/s/ shellabarger

R.27, Exh. 19.

**23.** *See Newman v. Huff*, 632 N.E.2d 799, 803 (Ind.App.1994) (stating that "[s]everal writings may constitute a written memorandum if each writing is signed by the party to be charged and if each writing indicates that it is related to the same transaction") (quoting *Block v. Sherman*, 109 Ind.App. 330, 34 N.E.2d 951, 954 (1941) (stating "signed instrument must so clearly and definitely refer to the unsigned one that by force of the reference the unsigned one becomes a part of the signed instrument")); *Graham v. Henderson Elevator Co.*, 60 Ind.App. 697, 111 N.E. 332, 335 (1916) (same); *see also Monetti, S.P.A. v. Anchor Hocking Corp.*, 931 F.2d 1178, 1185 (7th Cir.1991) (stating that, under Illinois law, court may connect writings if connections "are apparent from a comparison of the writings themselves").

from NUCOR to United concerns the agreement between those two parties. Aceros proved neither a direct nor an agency relationship between NUCOR and United on which Aceros could reasonably have relied.

### 3. Other claims

■ Aceros asserts that NUCOR is barred by the doctrine of promissory estoppel [24] from claiming that there is no contract under the statute of frauds. However, we believe that the district court properly rejected the claim because Aceros had failed to raise it as a counterclaim. *See Evans v. Fluor Distribution Co.*, 799 F.2d 364, 367 (7th Cir.1986) (stating that party cannot avoid summary judgment based on issue not properly pled in district court); *Agustin v. Quern*, 611 F.2d 206, 209 (7th Cir.1979) (holding that, when estoppel is not pled, it cannot form basis for challenge to summary judgment). An issue not properly raised in district court is waived on appeal. *Hayden v. La–Z–Boy Chair Co.*, 9 F.3d 617, 621 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1371, 128 L.Ed.2d 47 (1994). Accordingly, Aceros' promissory estoppel claim need not be considered on its merits.

Finally, on this record, we find no reversible error in the district court's decision that Aceros had no potential claim under the Texas DTPA. Because the district court had determined that the law of Indiana ought to govern the contractual relationships of the parties, it determined that the "DTPA is irrelevant," and that "Nucor neither is subject to nor has violated that statute." Order of Feb. 23, 1993, at 27. Aceros' only response is that the "most significant relationship" between NUCOR and Aceros occurred in Texas. In our discussion of choice of law, we have already determined that the district court did not err in holding that Indiana had the most significant contacts with the business relationship of the parties. It is not the task of this court to make on behalf of Aceros any other argument that might justify the entertainment of a cause of action based on

the Texas statute. *Cf. Beard v. Whitley County REMC*, 840 F.2d 405, 408–09 (7th Cir.1988) (noting that it is not the task of the appellate court to suggest arguments not raised by the appellant).

### Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.

---

24. The doctrine of promissory estoppel, adopted in Indiana, is found in Restatement (Second) of Contracts § 90 (1981):

(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.